Filed 6/27/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSHUA ANTHONY HARTLEY,<br><br>    Defendant and Appellant. | H041700<br>(Santa Clara County<br>Super. Ct. No. C1362361) |

Defendant Joshua Anthony Hartley arranged for a taxi ride home from a bar, then refused to pay the fare after arguing with the driver, who had missed a turn while Hartley was talking on his cellphone. Hartley accused the driver of trying to run up the meter. Hartley exited the cab and began to walk home. The driver caught up with Hartley in order to make a police report. Hartley confronted the driver and the men continued to argue; at one point, Hartley pulled a knife from his back pocket. A neighbor heard the disturbance and witnessed Hartley advancing on the driver, though the neighbor saw nothing in Hartley's hands. The neighbor called 911. The police arrived after the men had separated and as Hartley was continuing his walk home.

Hartley was charged with felony assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1);[1] count 1); felony criminal threats (§ 422; count 2), with an enhancement for personal use of a deadly and dangerous weapon (§ 12022, subd. (b)(1)); and misdemeanor petty theft of labor (§§ 484, 488; count 3). A jury acquitted Hartley of felony assault but convicted him of the lesser included offense of misdemeanor simple

---

[1] Unspecified statutory references are to the Penal Code.

assault (§ 240). The jury also acquitted Hartley of making criminal threats but convicted him of misdemeanor petty theft by false pretenses. The trial court sentenced Hartley to two years of probation, imposed conditions including an order to stay away from the victim, and ordered Hartley to pay a fine, penalty assessments, attorney fees, and restitution.

Hartley challenges the conviction for theft by false pretenses as unsupported by substantial evidence and challenges the stay-away probation condition as unconstitutionally vague. Hartley also argues—and the People concede—that the trial court failed to specify the required statutory bases for the fine and penalty assessments in the probation order. The People also request two corrections pertaining to the trial court's imposition of fines.

We find insufficient evidence to sustain the petty theft conviction and reverse judgment. We remand for resentencing on Hartley's conviction for simple assault, at which time the trial court shall specify the appropriate amounts and statutory bases for any fines, fees, and penalty assessments. If the trial court elects to re-impose the probation condition at sentencing, we find the condition adequately describes the proscribed conduct and may remain unchanged.

## FACTS

We limit our discussion of the facts and testimony as they pertain to the petty theft conviction. Hartley lives in San Jose and is employed. After work one evening, Hartley met with friends at a bar in Los Gatos. He called for a taxicab around 11:00 p.m. to take him home. While waiting for the cab, Hartley called a friend and began an animated conversation. Hartley remained on the phone with his friend when the cab arrived and while giving the driver directions.

Hartley testified that the driver "seemed confused" about the address, so Hartley told him "I'll make it easy. Let's just—I'll give you directions. Super simple." Hartley told the driver to take Blossom Hill Road and make a left on Leigh. Hartley was

2

still on the phone with his friend when he looked up and noticed the driver had continued down Blossom Hill and missed the turn on Leigh. Hartley described "a small argument" that quickly intensified over whether Hartley had told the driver where to turn. According to Hartley, the driver "kept arguing back, started to escalate, and he became more angry, started cussing. I started swearing. I was, like, 'What the fuck, Dude?' Excuse me. 'What the F?' . . . [¶] And so he started coming back at me, and at a certain point, he started yelling, 'Shut the F up. Shut the F up.' " The driver made a U-turn in order to take Hartley back toward Leigh. Hartley instead told the driver that he wanted to get out. "The last thing I said was that, 'I'm not effing paying for this. It's not how you talk to people,' and I slammed the door and walked."

The second altercation with the driver occurred as Hartley was walking home. Sometime during that altercation, or in a third altercation that followed (testimony of the driver and Hartley was conflicting on this point), Hartley drew a four inch pocket knife from his back pocket, though Hartley testified he showed the knife only to intimidate the driver who had "pull[ed] a bottle."[2] Also at some point during the second altercation, Hartley offered to pay the fare, saying " 'Look. Even though you tried to fuck me over, I'll pay you,' and [the driver] said 'No. Fuck you,' so I threw my arms up and walked away." Hartley also testified that he had lied to the police officer about pulling out his knife, explaining he was "Just scared. I didn't want to incriminate, didn't want to get in trouble." The defense called several character witnesses who testified on behalf of Hartley's character for honesty and nonviolence.

The driver testified at trial through a Somali interpreter, though he also speaks English. He had been a cab driver for about eight years when the incident occurred.

---

[2] We have omitted in large part those facts surrounding the renewed altercation between Hartley and the driver, which primarily pertain to the assault and criminal threats charges and are not at issue in this appeal.

He responded to the request for a pickup through his cab company. Hartley entered the taxicab while on his phone, and the driver "asked his name. The second question was where was he going to. He told me, 'Just take this same street we are on, Los Gatos Boulevard, and make a left on Blossom Hill.' " The driver testified that he "kept going on Blossom Hill . . . and then I again ask him, 'You want me still to continue?' " Hartley responded, " 'Where are we?' " The driver told him, " 'We are [at] the intersection of Blossom Hill and Camden.' Then he started shouting at me and said, 'You are supposed to make a turn on Leigh Street,' but unfortunately, he didn't say that before. [¶] Then he start cursing me and shouting at me, and then he got off the car." The driver described offensive slurs that Hartley used, including calling him "names, everything that can come to his mind," "the 'M-F' word," " 'nigger,' " and asking " 'What brought you here to this country?' " The driver testified that he responded, " 'Just give me my fare, please.'. . . . I did not ask anything else. I said, 'Could you please pay me the fare.' " The fare was about $16 or $17.

Hartley's friend, who was his girlfriend at the time of the trial, testified about the phone call during the cab ride. Over hearsay objections, the friend testified that she heard Hartley tell the taxi driver to turn on Leigh Street. After a few minutes, she heard Hartley say, " 'Hey, you missed my turn,' and then the other person in the car replied with, 'No, I didn't. You didn't tell me to turn.' " She heard them go back and forth. Hartley accused the driver of trying to run up the meter, after which "the other person began using profanity." The friend heard additional profanity and the driver "screaming" at Hartley; she did not hear Hartley use any racial slurs. Then Hartley told his friend he would call her back because he was going to try to get out. Hartley called her back about 10 minutes later as he was walking home. He told her that the driver was following him, he was feeling uneasy about being followed, and he would call her again when he got home.

A San Jose police officer interviewed Hartley immediately upon taking him into custody. At trial, the officer did not recall whether he found cash on Hartley. But in the

4

recorded interview, which was played for the jury during Hartley's cross-examination, Hartley told the officer that he had the money for the cab fare in his wallet.

DISCUSSION

## I. PETTY THEFT CONVICTION

### A.    Relevant Procedural Background

Hartley was charged with petty theft of labor in violation of sections 484 and 488. The prosecution sought to proceed on the alternative theories of larceny of labor or larceny by false pretenses. Defense counsel objected that "larceny of labor" was not a viable theory because it would have required proof that Hartley had taken or carried away the "personal property of another" within the meaning of the theft statute. (§ 484, subd. (a) [defining "theft" in relevant part as "feloniously steal, take, carry, lead, or drive away the personal property of another . . . ."].) Defense counsel asserted that labor and services were not "personal property." (See § 7, subd. 12.) The trial court agreed that "here, nothing was taken or moved" and permitted only the theft by false pretenses theory at trial.

The trial court instructed the jury on the theft charge using a modified version of CALCRIM No. 1804, stating: "To prove that the defendant is guilty of [petty theft by false pretenses], the People must prove that: [¶] One, the defendant knowingly and intentionally deceived a service provider by false or fraudulent representation or pretense; [¶] Two, the defendant did so intending to persuade the service provider to let the defendant use the service; [¶] And three, the service provider let the defendant use the service because the service provider relied on the representation or pretense." The court further instructed, in relevant part: "A false pretense is any act, word, symbol, or token for the purpose of which is to deceive. [¶] Someone makes a false pretense if, intending to deceive, he or she does one or more of the following: [¶] One, gives information he or she knows is false; [¶] Or, two, makes a promise not intending to do what he or she promises. [¶] The misrepresentation does not have to be made in an express statement.

5

It may be implied from behavior or other circumstances. [¶] . . . [¶] If you conclude that the People have proved the defendant committed petty theft, the return or offer to return all of the property wrongfully obtained is not a defense to that charge."

### B.  Analysis

Hartley argues that the required false representation with an intent to deceive cannot be proven by mere evidence of nonperformance of a contractual obligation, and that the prosecution's characterization of the law and the evidence in closing argument enabled the jury to find him guilty in the absence of substantial evidence.  We find there was insufficient evidence to sustain Hartley's conviction.

#### 1.  Standard of Review

In assessing a claim of insufficiency of evidence to support the conviction, we "review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 (*Rodriguez*).)  In so doing, we "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  We "do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.)  Thus "[w]e determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Maciel* (2013) 57 Cal.4th 482, 515, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

#### 2.  Substantive Law

Theft by false pretenses is the act of "knowingly and designedly, by any false or fraudulent representation or pretense, defraud[ing] any other person of money, labor or real or personal property . . . ." (§ 484, subd. (a).)  This requires "that the defendant made

6

a false pretense or representation with intent to defraud the owner of his property, and that the owner was in fact defrauded." (*People v. Ashley* (1954) 42 Cal.2d 246, 259 (*Ashley*).)  The false pretense may consist of a false promise or misrepresentation of existing fact.  (*Id.* at p. 264.)  "Proof of a false representation may be established by either words or conduct, or by both." (*People v. Fujita* (1974) 43 Cal.App.3d 454, 467 (*Fujita*).)  Yet "the defendant's intent must be proved in both instances by something more than mere proof of nonperformance or actual falsity . . . ." (*Ashley*, *supra*, at p. 264.)  The need to prove fraudulent intent prevents " '[o]rdinary commercial defaults' " from becoming "the subject of criminal prosecution." (*Id.* at p. 265.)

The crime of theft by false pretenses thus consists of three elements:  " '(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.' " (*People v. Williams* (2013) 57 Cal.4th 776, 787 (*Williams*).)  Any false or fraudulent representation or pretense within the meaning of the statute "shall be treated as continuing, so as to cover any money, property or service received as a result thereof . . . ." (§ 484, subd. (a).)  " 'The circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons may be looked to . . .' " for the requisite, corroborative evidence that the false pretense was made, if the conviction rests primarily on the testimony of a single witness. (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1441.)

### 3. Hartley's Petty Theft Conviction Lacked Substantial Evidence

The intent to commit a theft by false pretense "is a question of fact to be determined from all the circumstances of the case, and usually must be proven circumstantially." (*Fujita*, *supra*, 43 Cal.App.3d at p. 469.)  Hartley does not dispute that upon entering the cab, he made an implied promise to pay the fare upon arrival at his destination, or that the driver relied on that implied promise.  He also does not dispute the occurrence of a volatile argument in the cab and the altercations that followed.

7

The People argue that these facts, viewed in the light most favorable to the verdict, constitute substantial evidence that *at some point during the cab ride*, Hartley developed the intent to deceive the driver and to get a free ride.

It is true that in a prosecution for theft by false pretenses, the false promise or representation is treated as continuing until the property or service is acquired (§ 484, subd. (a); *Williams*, *supra*, 57 Cal.4th at pp. 787-788)—thus suggesting that it is enough for the intent to deceive to arise at any point concurrent with the continuing, false pretense. But viewing the record in the light most favorable to the judgment (*Rodriguez*, *supra*, 20 Cal.4th at p. 11), we fail to find any evidence from which the requisite intent can be inferred. We are constrained to conclude there was insufficient substantial evidence to sustain the necessary finding of fraudulent intent at any point during the relevant transaction.

The jury heard three accounts of what occurred during and after the cab ride. The driver testified that he asked Hartley if he should continue on the same street, at which point Hartley asked, " 'Where are we?' " When the driver told him, the two began to argue. The driver explained: "I did not stop right away. I was asking him—I asked him and he told me he's not going to pay me. And at the time, I start telling him, 'No, you should pay me,' but the reason I made the U-turn was to take him to his destination." As previously described, the driver also testified that Hartley shouted and swore at him, even using slurs. Though the driver's depiction of Hartley's angry tone and offensive language supports a variety of inferences that the jury reasonably could have drawn about Hartley's temperament that evening, we find no basis for an inference of fraudulent intent.

Hartley testified that by the time he realized what had happened and the driver made a U-turn, Hartley's tone was "a bit put off. I was upset. I was still trying to remain calm, but it just escalated." He described the driver's tone at that point as "[t]he same: Angry, upset." According to Hartley, the driver stopped the taxi because Hartley wanted

8

to get out, at which point he said, " 'I'm not effing paying for this. It's not how you talk to people.' " During the second altercation with the driver, after Hartley had begun to walk home, Hartley and the driver both testified that the driver continued to ask for payment, which Hartley refused. Hartley testified, "We were arguing back and forth. I was try—he was trying to get money from me. I told him that he was supposed to turn on Leigh. I told him I gave him directions; that I wasn't going to pay him; that I know he's still trying to run up the meter; just wasn't having it. I didn't want to be in the situation, so that's why I got out of the cab." Hartley's friend's testimony generally corroborated that of Hartley. She stated that after hearing Hartley tell the driver that he had missed the turn, Hartley said " 'I know what you're trying to do. I'm not going to pay you that extra fare. I know what you're doing. Just turn around and take me home.' "

Thus by these two accounts, Hartley decided not to pay because of his frustration with the driver and Hartley's suspicion that the driver was trying to inflate the fare. By all three accounts, Hartley told the driver directly that he would not pay. The People contend that in reaching their verdict, the jury likely rejected Hartley's claim for why he refused to pay the fare, because Hartley's "conduct was not a reasonable response to a contractual dispute" and because his credibility had been called into question based on his admitted dishonesty with the police. We are mindful that it was for the jury to determine the witnesses' credibility and to weigh the testimony of each. (*Ashley*, *supra*, 42 Cal.2d at p. 266; *People v. Cortes*, *supra*, 71 Cal.App.4th at p. 71.) But even if the jury entirely discredited Hartley's and his then-girlfriend's testimony and disbelieved Hartley's explanation for refusing to pay, the remaining evidence offered no reasonable basis for a finding that Hartley "knowingly and designedly" made a false or fraudulent representation or pretense in order to defraud the driver. (§ 484, subd. (a).)

The Supreme Court's evaluation of substantial evidence for the theft by false pretenses conviction in *Ashley* is instructive. The jury in *Ashley* found the defendant guilty of several counts of grand theft after he contrived certain monetary loans and

9

property transfers in the name of the business he managed. (*Ashley*, *supra*, 42 Cal.2d at pp. 251-252.) The high court found substantial evidence justified the "implied finding" that the defendant had acquired the money and property "with felonious intent." (*Id.* at p. 267.) Not only was the defendant's promise of an "ambitious theater project . . . never realized," the *Ashley* court found the jury reasonably could have concluded the defendant "had deliberately set out to acquire the life savings of his victims" based on his "flattering offers of positions in the organization and false promises of security for their loans," followed by his "importunate and then menacing supplications." (*Ibid.*) Thus in *Ashley*, intent did not derive from the defendant's broken promises regarding his business plans, but from circumstantial evidence based on the defendant's conduct toward the victims throughout the course of an elaborate operation in which the defendant convinced the victims to transfer money and property. (*Ibid.*)

So too in *Fujita*, *supra*, 43 Cal.App.3d at page 469, the court found substantial evidence "that the defendants intentionally employed a false representation to defraud [the victim farmer] of his money" as part of a political " 'shake down' " (*id.* at p. 467) relating to a valuable agricultural lease. The evidence showed that the defendants had conveyed to the victim, "by word and deed," the impression that he had to pay them in order to ingratiate himself to the board of supervisors and retain his lease; but the defendants' position at trial was "that they never intended to use any of [the victim]'s payment to bribe, 'pay off' or otherwise purchase favor" from the board. (*Id.* at p. 469.) The court thus found that the "contrived false promise (e.g., to pay off the board of supervisors), coupled with defendants' intention to make no such payments," led to the "unavoidable conclusion that the defendants intentionally employed a false representation to defraud" the victim. (*Ibid.*)

We contrast the robust facts in *Ashley* and *Fujita* to the facts arguably supporting an inference of fraudulent intent here. Whereas each of those cases involved a sequence of intentional conduct toward the victims that operated to convince the victims to take the

10

bait on a false promise, Hartley's conduct in becoming aggressive and verbally abusive in the course of the argument in the cab did not deceive the driver into continuing the drive, because it was at that point that, by all accounts, Hartley told the driver that he wanted to get out and that he would not pay. The evidence of Hartley's implied promise to pay, the driver's reliance thereon, the intervening argument, and Hartley's ultimate refusal to pay, do not add up to the critical element of fraudulent intent.

Nor do we find any other circumstantial evidence, such as that of other similar acts by the defendant, from which intent could reasonably be inferred. (See, e.g., *People v. Miller*, *supra*, 81 Cal.App.4th at pp. 1447-1448 [evidence of similar, uncharged incidents admissible to prove disputed intent element in prosecution for theft by false pretenses] and *People v. Kiperman* (1977) 69 Cal.App.3d Supp. 25, 31 [theft by false pretenses conviction supported by defendant's similar promises to numerous customers which "were not kept"].) The prosecution elicited no evidence of other similar schemes by Hartley, or of an ulterior motive to "manufacture a conflict" in order to cheat the driver of his pay. Rather, the evidence showed that Hartley was gainfully employed, and the prosecution introduced Hartley's taped interview with the police officer in which he said that he had the money for the cab fare in his wallet.

We do not condone Hartley's conduct. But we find that without substantial evidence of an intent to defraud, his failure to pay the driver was akin to a transaction-gone-bad or, in the words of *Ashley*, " '[o]rdinary commercial default[].' "[3] (*Ashley*, *supra*, 42 Cal.2d at p. 265.)

---

[3] The out-of-state cases that Hartley references offer a range of similarly reproachable conduct that did not amount to theft by false pretenses. (See, e.g., *Smith v. State* (Ala. Crim. App. 1995) 665 So.2d 1002, 1004 [finding only that defendant "failed to perform a contractual obligation he had with the victim" when he accepted her money but did not complete the T-shirts he had promised to produce]; *People v. Ramirez* (N.Y. App. Div. 1990) 168 A.D.2d 908, 909 [no proof that defendant did not intend to pay for merchandise she obtained on credit despite her implied promise at the time]; *State v.* (continued)

11

Hartley also argues that the prosecution's characterization of the law and the evidence in closing argument enabled the jury to find Hartley guilty in the absence of substantial evidence. We are guided on this point by the California Supreme Court's analysis in *People v. Morales* (2001) 25 Cal.4th 34 (*Morales*), which involved a claim on appeal that the prosecutor had misled the jury about the law governing PCP possession. (*Id*. at pp. 41-42.) After reviewing the evidence at trial and the prosecutor's closing argument, the court found that the prosecutor had "arguably misstated some law" but that "such an error would merely amount to prosecutorial misconduct [citation] during argument, rather than trial and resolution of the case on an improper legal basis." (*Id*. at p. 43.) In the case of misconduct, the defendant must timely object to the prosecutor's statements. (*Id*. at pp. 43-44.) Even though the court found that Morales had waived objection to the prosecutor's statements, the court analyzed the alleged misconduct, noting it would be inaccurate to focus solely on the prosecutor's closing remarks "stripped of their context." (*Id*. at p. 46.) The court considered the prosecutor's summation set against the evidence and the trial court's instructions to the jury, and concluded there was "no reasonable likelihood that the prosecutor's arguments misled the jury in an objectionable fashion—i.e., so as to improperly convict him of possessing PCP." (*Id*. at p. 47.)

Like in *Morales*, Hartley essentially makes a prosecutorial misconduct argument, though the defense did not object in the trial court to the prosecutor's statements that Hartley now asserts were misleading. We find Hartley has waived his claim pertaining to the impact of the prosecutor's remarks. (*Morales*, *supra*, 25 Cal.4th at p. 44.)

---

*Basham* (Mo. Ct. App. 1978) 571 S.W.2d 130, 133 [evidence showed a failure to adequately perform work in each of defendant's contracts, but did not support an inference of intent to deceive customers]; *Commonwealth v. Graham* (1991) 528 Pa. 250, 252 [conviction of "theft by deception" unsupported by any facts other than nonperformance when defendant failed to deliver cocaine to the police informant].)

12

Having already concluded on the basis of the evidence alone that the intent element was not supported by substantial evidence, however, our finding of waiver has little appreciable effect.[4]

In sum, we find no direct or circumstantial evidence in the trial record from which the jury reasonably could have inferred that Hartley's decision not to pay the cab fare was anything more than a broken promise. The judgment must be reversed and the matter remanded for resentencing in light of Hartley's remaining conviction (count 1).

## II. SENTENCING

The trial court imposed sentence on November 14, 2014. The court stated that it was "sentencing [Hartley] for the charges that he was convicted of which here are two misdemeanors. So we're talking about a misdemeanor petty theft. . . . [¶] And, in addition, there was a simple assault." The court ordered two years of probation and imposed a fine, fees and penalty assessments. Although we reverse the judgment, we consider Hartley's other contentions in light of the need for resentencing on remand on the simple assault conviction.

---

[4] We note that the statements Hartley finds objectionable did not occur in a vacuum, but in the context of the prosecutor's entire closing argument, the trial court's instructions to the jury, and the evidence itself. (*Morales*, *supra*, 25 Cal.4th at p. 46 [prosecutor's remarks may not be "stripped of their context" and are properly viewed alongside all the evidence and the trial court's jury instructions].) While the prosecutor's advocacy in closing argument may have confused the jury insofar as she appeared to advocate a general larceny theory (describing petty theft as "unlawful taking") and repeatedly emphasized Hartley's failure to pay the fare (as opposed to intent to deceive), those remarks must be viewed in balance with the prosecutor's references to the People's burden to prove all of the elements of theft by false pretenses, as well as the trial court's instructions to the jury, which Hartley does not challenge. (See *People v. Boyette* (2002) 29 Cal.4th 381, 453 [potential prejudice based on prosecutor's improper statements not realized given trial court's careful instructions to the jury].)

### A. No Contact Probation Condition

The trial court prohibited Hartley from having any contact with the driver as a condition of probation. The court explained its order on the record: "I'm also going to order . . . no contact with the named victim. And that's no personal, electronic, telephonic or written contact with him. And you also stay at least a hundred yards away from the protected person who counsel, the DA, just named. Stay at least a hundred yards from the protected person[] at all times. So it's a no contact order with the named victim."

Hartley challenges the no contact order as unconstitutionally vague. He argues that in its current form, it is unclear whether unwitting violations of the probation condition fall within its scope. Citing cases such as *People v. Petty* (2013) 213 Cal.App.4th 1410, 1424-1425 and *People v. Rodriguez* (2013) 222 Cal.App.4th 578, 595, he argues that an express knowledge requirement (may not *knowingly* come within 100 yards of the driver) can remedy the deficiency. The People dispute that the probation condition is invalid, arguing that a knowledge requirement is implicit in the condition.

"[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 890 (*Sheena K.*).) "A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness." (*Ibid.*) Hartley's failure to object to the condition in the trial court does not forfeit the issue on appeal because a vagueness challenge can be resolved as a matter of law. (*Id.* at pp. 888-889.)

Whether a no-contact probation condition must be "modified to explicitly include a knowledge requirement" is an issue currently pending before the California Supreme Court. (*In re A.S.*, rev. granted Sept. 24, 2014, S220280.) Pending guidance on this issue, we look to the meaning of the probation condition as it " 'would appear to a

14

reasonable, objective reader' " (*People v. Olguin* (2008) 45 Cal.4th 375, 382) and in light of the Supreme Court's earlier decision in *Sheena K.*

An objective reading of the trial court's order leaves no doubt as to the scope of the prohibited conduct. The probation condition requires Hartley to refrain from any contact with the driver, whether physical presence (within 100 yards), electronic, telephonic, or written. The individual targeted for protection is clearly identified in the record. This distinguishes the probation condition at issue from conditions that courts have modified because they lacked an essential knowledge element with respect to *who* or *what* the probationer was to avoid, as in *Sheena K.*, *supra*, 40 Cal.4th at page 891 (condition "did not notify defendant in advance with whom she might not associate . . . .") and in *People v. Rodriguez*, *supra*, 222 Cal.App.4th at page 595 (probation order did not sufficiently identify victims).

Hartley, in contrast, would impose an express knowledge element with respect to the act of making contact or, more simply, the act of association (to not *knowingly* come within 100 yards of the driver). We do not read in *Sheena K.* or prior decisions of this court to require such an addition. The court in *Sheena K.* approved a modified do-not-associate probation condition "inserting the qualification that defendant have knowledge of who was disapproved of by her probation officer, and thus securing the constitutional validity of the probation condition." (*Sheena K.*, *supra*, 40 Cal.4th at p. 892.) The court suggested that "form probation orders be modified so that such a restriction explicitly directs the probationer not to associate with anyone 'known to be disapproved of' by a probation officer or other person having authority over the minor." (*Ibid.*)

In *People v. Rodriguez*, this court rejected the argument that an order requiring the defendant to " '[s]tay away at least 100 yards from the victim, the victim's residence or place of employment, and any vehicle the victim owns or operates' " *required* an express knowledge element. (*People v. Rodriguez*, *supra*, 222 Cal.App.4th at p. 594.) We

15

explained that "[n]o reasonable law enforcement officer or judge can expect probationers to know where their victims are at all times. The challenged condition does not require defendant to stay away from all locations where the victim might conceivably be. It requires defendant to remove himself ('Stay away at least 100 yards . . . .') when he knows or learns of a victim's presence." (*Ibid.*)

We find this reasoning consistent with the established principle that "a probation violation must be willful to justify revocation of probation. [Citations.] . . . '[A] crime cannot be committed by mere misfortune or accident.' " (*People v. Rodriguez, supra*, 222 Cal.App.4th at p. 594, quoting *People v. Coria* (1999) 21 Cal.4th 868, 876; § 26.) Yet in *People v. Rodriguez* we remanded the case because of ambiguities in the stay-away condition, including the failure to name the victims and to denote any prohibited locations or vehicles. (*People v. Rodriguez, supra*, at pp. 594-595.) We stated that the trial court on remand "may modify the condition to require that defendant not knowingly come within 100 yards of a known or identified victim." (*Id.* at p. 595.)

A panel of this court made a similar distinction in *People v. Contreras* (2015) 237 Cal.App.4th 868, 888, which involved a probation condition prohibiting the defendant's possession of "surveillance equipment." The *Contreras* court determined that a knowledge requirement was not required to prevent an unwitting violation of the probation condition, but was "necessary to eliminate vagueness and overbreadth in the description of the prohibited devices and activities."[5] (*Id.* at p. 889.) The court remanded the case with direction for the trial court to modify the surveillance condition because it found the challenged condition was vague and overbroad "in the description of the prohibited devices and activities." (*Ibid.*)

_____

[5] Although the court's reasoning in *Contreras* echoed that of a First District case in which the Supreme Court has since granted review (*People v. Hall*, rev. granted Sept. 9, 2015, S227193), we continue to abide by the analysis in *Contreras* pending decisions in *People v. Hall* and in *In re A.S., supra*, S220280.

16

Hartley's effort to analogize alleged vagueness in the condition here to that in *Contreras* is unavailing. Hartley argues the stay-away order is unconstitutional "not because it could allow unwitting violations of the probation condition, but because the order is vague as to whether unwitting violations fall within its scope." This is a distinction without a difference. Unlike the myriad devices that arguably could be considered "surveillance equipment" in *Contreras*, the activities proscribed by the trial court's stay-away order are not being challenged. The addition of an express knowledge requirement would only make explicit what already is implicit: Hartley must be aware of or have knowledge of the driver in order to personally—or by other means—contact him. (See *People v. Rodriguez*, *supra*, 222 Cal.App.4th at p. 595.)

Hartley also relies on *People v. Petty*, *supra*, 213 Cal.App.4th 1410. There the court modified a probation condition to state that the "defendant must not 'knowingly' come within 100 yards of the victim or her daughter." (*Id.* at pp. 1424-1425.) Other than noting that the modification was made at the "defendant's request," however, the court in *People v. Petty* offered no rationale for the modification. (*Id.* at p. 1424.) Because we find the probation condition adequately describes the proscribed conduct and does not deprive Hartley of " 'fair warning' " in order " 'to know what is required of him, and for the court to determine whether the condition has been violated,' " (*Sheena K.*, *supra*, 40 Cal.4th at p. 890) the stay-away probation condition can remain unchanged if the trial court elects to re-impose it on remand.

### B.      Fines, Fees, and Penalty Assessments

Hartley challenges the trial court's imposition of a fine and penalty assessments as unauthorized due to the failure to specify the statutory bases for the amount imposed. The People agree that the order should be amended to reflect the statutory bases for the fine and penalty assessments. The People additionally raise two issues for correction related to the fine and penalty assessments.

17

### 1. Relevant Procedural Background

At the sentencing hearing, the trial court stated: "[Y]ou are ordered to pay a fine of $100. When I add in all the penalty assessments and everything it works out to be $704. [¶] I am going to impose a[n] additional probation revocation restitution fine. I believe this is 2013—so I think it's in the amount of $140 on the second fine. But that is suspended, unless the defendant's probation is revoked." The court also ordered general restitution to the cab company and imposed $500 in attorney's fees and a $35 payment plan fee. The court did not refer to a probation report or any written statement delineating the bases for the fine and penalty assessments. Neither party objected.

The minute order lists the following information pertaining to the financial obligation imposed: $100 fine (does not specify whether for assault count or petty theft count); $310 "PA" penalty assessment; $154 "RF" restitution fine; additional $140 "RF" restitution fine, suspended pursuant to section 1202.44; $80 "SECA" court security fee; $60 "ICMF" conviction assessment fee; $35 payments fee; $500 attorney's fees; and general restitution to Yellow Cab. Excluding the attorney's fees, the $35 payment plan fee, and the suspended $140 restitution fine, these amounts total $704.

### 2. Failure to Specify the Statutory Bases for the Fine and Penalty Assessments

It is undisputed that the trial court failed to specify the statutory bases for the $704 imposed on Hartley. Both sides suggest that under the "unauthorized sentence" exception to the waiver rule, this court can consider the issue even though neither party objected before the trial court.

We agree with the parties that the trial court erred in failing to specify the statutory bases for the fine, fees, and penalty assessments imposed.[6] As stated in *People v. High*

---

[6] The People offer a breakdown of the likely, statutory bases for the $704, asserting that the amount appears to be supported by law:
(continued)

(2004) 119 Cal.App.4th 1192, 1200 (*High*), "[a]lthough . . . a detailed recitation of all the fees, fines and penalties on the record may be tedious, California law does not authorize shortcuts. All fines and fees must be set forth in the abstract of judgment." Moreover, "[a] detailed description of the amount of and statutory basis for the fines and penalty assessments imposed would help the parties and the court avoid errors in this area." (*People v. Hamed* (2013) 221 Cal.App.4th 928 (*Hamed*).)

This court in *Hamed* recognized several ways for a trial court to perform this duty. "A trial court could recite the amount and statutory basis for any base fine and the amounts and statutory bases for any penalty assessments on the record, as *High* suggests should be done. (*High*, *supra*, 119 Cal.App.4th at p. 1200.) Or, in cases where the amounts and statutory bases for the penalty assessments have been set forth in a probation report, a sentencing memorandum, or some other writing, the court could state the amount and statutory basis for the base fine and make a shorthand reference in its oral pronouncement to 'penalty assessments as set forth in the' probation report, memorandum, or writing as authorized in [*People v. Sharret* (2011) 191 Cal.App.4th 859] and [*People v. Voit* (2011) 200 Cal.App.4th 1353]." (*Hamed*, *supra*, 221 Cal.App.4th at pp. 939-940.)

---

(1) $100 base fine pursuant to section 1203.1, subdivision (a)(1), which authorizes the court to "fine the defendant in a sum not to exceed the maximum fine provided by law in the case," which in Hartley's case may not exceed $1,000 for either conviction of assault (§ 241, subd. (a)) or petty theft (§ 490);

(2) $310 in penalty assessments are likely the sum of a $100 penalty (§ 1464, subd. (a)), a $20 surcharge (§ 1465.7, subd. (a)), a $50 penalty (Gov. Code, § 70372, subd. (a)(1)), a $70 penalty (Gov. Code, § 76000, subd. (a)(1)), a $20 penalty (Gov. Code, § 76000.5, subd. (a)(1)), a $10 penalty (Gov. Code, § 76104.6, subd. (a)(1)), and a $40 penalty (Gov. Code, § 76104.7, subd. (a)(1)); and )

(3) the remaining $294 as set forth in the minute order: $154 "RF" restitution fine (§ 1202.4, subd. (b)(1)), $80 "SECA" court security fee (§ 1465.8, subd. (a)(1)), and $60 "ICMF" assessment fee (Gov. Code, § 70373, subd. (a)(1)).

19

This failure to specify the amount and statutory basis for each fine, fee, and penalty assessment is a "legal error[] at sentencing" that can be reviewed on appeal " 'regardless of whether an objection or argument was raised . . . . ' " (*People v. Smith* (2001) 24 Cal.4th 849, 852 ["[O]bvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings are not waivable."].)  On remand for resentencing, the trial court shall specify the appropriate statutory bases for any fine, fee, and penalty assessments that it imposes.

### 3. Erroneous Restitution Fine Amount; Mandatory Fine Omitted

The People contend the trial court failed to impose a mandatory $10 theft fine pursuant to section 1202.5, subdivision (a), plus penalty assessments.  We need not address this contention in light of our determination that the petty theft conviction cannot be sustained due to a failure of substantial evidence.

The People also contend the trial court clerk erroneously listed in the minute order the suspended restitution fine as $140 rather than $154, which error should be corrected on remand.  The People argue that under section 1202.44, the suspended restitution fine should equal the probation revocation restitution fine imposed pursuant to section 1202.4, which according to the minute order was $154.  In response, Hartley agrees the minute order should be modified but urges the appropriate correction is to reduce the probation revocation restitution fine to $140 in order to reflect the trial court's oral judgment.

When there is a discrepancy between the record of the court's oral pronouncement of judgment and the clerk's minute order, the oral pronouncement controls.  (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070 [abstract of judgment "cannot prevail over the court's oral pronouncement of judgment to the extent the two conflict"]; *People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Sharret*, *supra*, 191 Cal.App.4th at p. 864.)  The $140 restitution fine imposed and suspended at sentencing was a permissible amount for a misdemeanor offense occurring in 2013.  (§ 1202.4, subd. (b)(1) [starting on January 1, 2013, fine for misdemeanor conviction shall not be less than $140

and not more than $1,000].)  Section 1202.44 mandates an additional probation revocation restitution fine in the same amount.  On remand for resentencing, the trial court shall specify the amount of restitution fine pursuant to section 1202.4 and shall impose a probation revocation restitution fine in the same amount pursuant to section 1202.44.

## DISPOSITION

The judgment is reversed and the matter is remanded for resentencing on the remaining misdemeanor conviction (simple assault, Pen. Code, § 240; count 1).  In resentencing Hartley, the trial court is directed to identify the amounts and statutory bases for any fines, fees, and penalty assessments imposed, in a manner consistent with this opinion.

_____
                               Premo, J.

WE CONCUR:

_____
      Rushing, P.J.

_____
      Márquez, J.

People v. Hartley
H041700

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. C1362361 |
| --- | --- |
| Trial Judge: | Hon. William J. Monahan |
| Counsel for Plaintiff/Respondent:<br>The People | Kamala D. Harris<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>Dorian Jung<br>Deputy Attorney General<br><br>Lauren Apter<br>Deputy Attorney General |
| Counsel for Defendant/Appellant:<br>Joshua Anthony Hartley | Under appointment by the Court of Appeal<br>Law Office of Alexis Haller<br>Alexis Haller |

People v. Hartley
H041700