Filed 12/31/20  P. v. Walker CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TAMMY LOUISE WALKER,<br><br>        Defendant and Appellant. | A155507<br><br>(Contra Costa County Super. Ct. No. 51802115) |

Defendant was convicted of a number of charges, including two counts of driving under the influence of alcohol (DUI) and causing injury within 10 years of another DUI offense, and driving on a suspended license.  The jury also found true great bodily injury enhancements.

The trial court imposed, but suspended execution of, a six-year prison sentence and placed defendant on probation subject to a number of terms and conditions, including that she wear a SCRAM device at all times, enter and complete a 12-to 18-month alcohol rehabilitation program, waive all credits for time served prior to sentencing, waive her right to appeal, and waive any objection to the court's imposing the maximum, aggravated sentence for her DUI offenses.  The court also made the requisite findings to support the aggravated term, stating as follows: "I'm going to make the finding that the

aggravated term in this case is the appropriate, and given the seriousness of the misconduct, the nature of the driving, the devastating nature of the lifetime injuries sustained by our [Highway Patrol] officer in the case, there is no question that this, especially given the history of the defendant, required the aggravated sentence."

The court had considerable reservations about placing defendant on probation and made it clear to her that if she failed, for any reason, to enter and complete the program, the court would revoke probation and remand her to state prison:

"[Court]: . . . So, Miss Walker, you understand that I have a very difficult decision in front of me here?

"[Defendant]: Yes, your Honor.

"[Court]: And you understand that a big part of that decision depends on you, and your willingness and ability to be a successful patient in a treatment program on probation?

"[Defendant]: Yes. [¶] . . . [¶]

"[Court]: Do you also understand that in the future, if you violate probation, you'll be back here sitting in the courtroom, probably with your family members[,] asking me to forgive your relapse, you understand that's a likely scenario?

"[Defendant]: Yes, I understand.

"[Court]: And do you understand that if I were to give you a chance, that I will absolutely not give you a second chance, no matter how slight that relapse may be?

"[Defendant]: Yes, I understand.

"[Court]: Okay. So that means if you go and you take some cough medication that's not permitted under this program, and it gives a positive read on the SCRAM, you'll be back here, and you will be

2

remanded to serve your six-year term. Do you understand it's the slightest violation of any law, including the SCRAM program, including the rules of this treatment program?

"[Defendant]: Yes, I understand.

"[Court]: Do you think you're capable of doing that?

"[Defendant]: Yes, your Honor."

"[Court]: . . . So I guess this is the time, Miss Walker, before I do this, that I want to make sure that you and I are on the same page, because I don't want there to be any misunderstandings about when you come back here. Because you understand [the prosecutor] has said I'm making a big mistake by giving you this chance.

"He has said that I–I'm making a mistake, and he thinks that the mistake is going to show itself by you hurting someone. He might be right in this sense. I don't think you will hurt someone, but I think he might be right that you might not ready to do this, and you might be required to do state prison time in the sense that you're not going to take this program seriously, which will show itself to me by you not paying attention, or worse, by taking medications or alcohol. Do you understand what I'm saying?

"[Defendant]: Yes.

"[Court]: If you come back here and we find that there's some kind of violations with the program rules, or you've consumed alcohol, no matter how traumatic your excuse is, you understand this sentence will be imposed?

"[Defendant]: Yes."

Within weeks, the prosecution filed a petition to revoke defendant's probation, alleging she had "not been accepted into the [rehabilitation] program." Following a contested hearing, the court revoked and terminated probation and remanded defendant to serve her six-year prison sentence.

3

Defendant challenges the revocation of her probation and also challenges the fines and fees imposed for several reasons, including on the basis of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We affirm the revocation of probation and execution of the suspended sentence. As to two of the fines, we reverse and remand for the trial court to identify their statutory basis; we otherwise also affirm the fines and fees.

### *Revocation of Probation*

A decision to revoke probation involves two components: (1) a retrospective factual question whether the probationer has violated a condition of probation, and (2) a discretionary determination by the court whether the violation warrants revocation of probation and sentencing to prison. (*Black v. Romano* (1985) 471 U.S. 606, 611.) The court has discretion to revoke, modify, or continue probation as originally set, depending upon its analysis of the circumstances before it. (*People v. Hawthorne* (1991) 226 Cal.App.3d 789, 792; Pen. Code, § 1203.2, subd. (b)(1).)

The facts supporting a revocation of probation need only be proven by a preponderance of the evidence. (*People v. Rodriguez* (1990) 51 Cal.3d 437, 439 (*Rodriguez*).) But the evidence must support a conclusion the probationer willfully violated the terms and conditions of probation. (*People v. Cervantes* (2009) 175 Cal.App.4th 291, 295 (*Cervantes*).)

A willful violation requires " 'simply a purpose or willingness to commit the act . . . ,' without regard to motive, intent to injure, or knowledge of the act's prohibited character. [Citation.] The terms imply that the person knows what he is doing, intends to do what he is doing, and is a free agent. [Citation.] Stated another way, the term 'willful' requires only that the prohibited act occur intentionally." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1438.) "Where a probationer is unable to comply with a probation

4

condition because of circumstances beyond his or her control and defendant's conduct was not contumacious, revoking probation and imposing a prison term are reversible error." (*Cervantes, supra,* 175 Cal.App.4th at p. 295, *id.,* at pp. 293, 295 [while in custody of immigration authorities probationer did not willfully fail to attend hearing]; accord *People v. Zaring* (1992) 8 Cal.App.4th 362, 379 [probationer's late court appearance due to unforeseen circumstances was not willful].)

We review a factual finding that the defendant violated his or her probation for substantial evidence. Under this standard, we determine only whether, in view of the entire record, there is substantial evidence, contradicted or uncontradicted, to support the trial court's decision. (*People v. Kurey* (2001) 88 Cal.App.4th 840, 848–849.) To be " 'substantial,' " evidence must be " 'of ponderable legal significance[,] reasonable in nature, credible, and of solid value.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576; *People v. Cole* (1994) 23 Cal.App.4th 1672, 1678.) We give great deference to the trial court and resolve all inferences and intendments in favor of the judgment. (*Kurey,* at pp. 848–849.)

Once the trial court has found a violation of probation it must "decide whether under all of the circumstances the violation of probation warrants revocation." (*People v. Avery* (1986) 179 Cal.App.3d 1198, 1204.) On this second step the trial court is vested with broad discretion (*People v. Jones* (1990) 224 Cal.App.3d 1309, 1315), and its decision is reviewed only for abuse of that discretion. (*Rodriguez, supra,* 51 Cal.3d at p. 442.) " '[O]nly in a very extreme case should an appellate court interfere with the discretion of the trial court in the matter of denying or revoking probation. . . .' " (*Id.* at p. 443.)

At the revocation hearing, Belinda Thomas, a co-founder and the CEO of the REACH program, testified in pertinent part as follows: She personally conducts many of the screening interviews for women who are slated to go into the program. As part of that process, she looks for "certain warning signs" that indicate an individual may not be "the right fit for the program." "I look for attitude. Resistance. If they can follow instructions appropriately. Those are the bigger things. And we also look for faithfulness in people coming to class on time."

Thomas had met defendant prior to sentencing while defendant was attending in-jail classes, and during that time "she was pretty faithful to the class, and we got to know [defendant] pretty well . . . most of the times she was pretty faithful. . . ." "Out of four times a month, she might come three or two. . . . So she was not every Thursday, but she was one of the regulars."

After sentencing, Thomas conducted the formal intake interview necessary for defendant to move from the jail to the program. "[T]he screening was to make sure she got all her paperwork that she needed to start Ujima West right away, which is the rehab program." Thomas brought the paperwork with her to the jail. As she started to go over it with defendant, "she, you know, got hostile and said, what do you mean, this is the paperwork? I thought I was going to REACH. I'm not going. I didn't know I was going to be going to no rehab." Thomas explained that was what the court required, to make sure defendant remained sober for "this whole year." At this point, defendant "became very sluggish and labile." Thomas then turned to assist another inmate and left defendant to start "filling out [the] paperwork."

Thomas also told defendant she would need to call the "access line" to "screen for . . . Ujima West." Defendant responded that she had already

called the access line and "they didn't even do nothing for me. They had me calling all these–so she was mainly argumentative, and didn't want to do the access line. But I explained to her the necessity of it."

After about a half hour, defendant told Thomas she had not completed the paperwork. Thomas said that was fine, but defendant needed to at least call the access line. At this point, defendant said she didn't know any of the phone numbers.

Thomas, by this time, was concerned about "all the excuses that [defendant] came up with [¶] . . . [¶] the resistance." And compared with other screening interviews Thomas had conducted, she found defendant to be "[e]xtremely uncooperative." Defendant did not even "pretend that she really wanted to be with us."

Thomas therefore left the jail with considerable doubt as to whether defendant would be admitted into the program. But both Thomas and the board of directors of the program deferred judgment, since defendant had the remainder of the day (a Friday) and the weekend to complete the paperwork, call the access line and then get in touch with the program.

However, there was no call. Accordingly, the board made the decision to reject defendant. "[O]nce she never called on Monday, the board said, no . . . if she's resisting now, it would be too hard. . . ."

Defendant also testified at the hearing. She denied being resistant to Thomas's instructions, pointing out the paperwork consisted of six pages printed on both sides. She made a number of calls to the access line, and within several days of the intake interview had gotten the required TB test paperwork in order. Acknowledging that her daughter had indicated a lack of support for her entering the rehabilitation program, defendant stated the program physician had asked defendant how she felt. "So I said, well, since

7

it's a court order, then let's go ahead with it, and I felt no way otherwise." Defendant did not believe anything had gone "wrong" at the intake session.

Following testimony, the prosecutor and defense counsel argued to the court.

The prosecutor asserted there was ample evidence defendant had not entered the program as required and the court should credit Thomas's opinion that defendant had demonstrated she was not serious about sobriety and recovery and not ready for the rigors of the recovery program.

Defense counsel argued there had been a "misunderstanding" about, and not a violation of, probation and defendant had not had sufficient time to complete the paperwork. Counsel urged the court not to view defendant's "giv[ing] Miss Thomas attitude" as "conclusive proof" defendant was not receptive to treatment, asserting there could have been "a number of other explanations" as to "why the two women clearly were not seeing eye-to-eye on that day." On inquiry by the court, defense counsel acknowledged defendant never completed the paperwork required to enter the program. Nor did counsel dispute that defendant could have taken steps to do so.

The court commenced its oral ruling by stating it had been "a very difficult decision . . . to avert doing what I think the law required me to do, which was impose a state prison sentence given the seriousness of the defendant's conduct." After investigation and discussion with the directors of two rehabilitation programs, the court had selected REACH, which oversees a number of programs, including the Ujima rehabilitation program.

The court found the defendant's "paperwork argument" "just one measure of the failure of the defendant to fulfill the suspended sentence condition." Even before the screening interview, "the defendant had backed off. Her attendance had changed, an[d] she was not attending every

8

Thursday." Then Thomas observed "the behavior of defendant was not a normal demeanor." "She noticed that the defendant became hostile to the paperwork, and was sluggish and labile, dismissive and argumentative. None of these are positive factors." And had defendant displayed these behaviors at the time of sentencing, the court would not have discussed probation and would "have simply imposed the aggravated term of six years and there would have been no further discussion about it." The court also reemphasized the justifications for the aggravated sentence.

The court then noted there were several ways of looking at what had transpired. One, that admission into the program was a condition precedent to probation, which failed to occur. Two, that failure to enter the program was a violation of the terms and conditions of probation. And three, that the basis for defendant's agreement to probation and suspended execution of sentence was entry into the program. The court went on to state it made no difference how one looked at the case, however, as the result would be the same—the court would impose the aggravated, six-year prison term.

Defendant complains the trial court did not make an express finding that she "willfully" violated probation. However, defendant never requested an express finding; nor is such an express finding statutorily required. (See *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 [" '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision' "]; *Finney v. Gomez* (2003) 111 Cal.App.4th 527, 545 ["reviewing court will infer all findings necessary to support the [ruling] and then examine the record to see if the findings are based on substantial evidence"].)

Defendant next maintains there is no evidence she "willfully" violated her probation. She claims it was the rehabilitation program "not [defendant],

9

who decided [defendant] was not 'a good fit' for its program." In other words, defendant asserts it was the rehabilitation program's fault, not hers, that she failed to enter the program.

However, as we have recited in detail, the program's decision to reject defendant was precipitated by, and a consequence of, *defendant's* conduct. Not only did defendant's "hostile" and "argumentative" conduct at the Friday intake session cause Thomas and the board of directors grave concern about defendant's willingness and ability to commit to overcoming her alcohol addiction, but when, even in the face of this "resistance," defendant was given the opportunity to complete the intake process over the weekend and call in to the program on Monday, she failed to do so, resulting in the decision to not accept her. In short, *defendant*, not the program, was responsible for her failure to comply with the pivotal condition of her probation, to enter and complete the rehabilitation program.

Generally speaking, "[w]illfully implies no evil intent; ' "it implies that the person knows what he is doing, intends to do what he is doing and is a free agent." ' " (*People v. Bell* (1996) 45 Cal.App.4th 1030, 1043, abrogated on another ground in *People v. Athar* (2002) 105 Cal.App.4th 479, 488.) In statutory language, "willfully" generally "defines a general criminal intent, absent other statutory language that requires 'an intent to do a further act or achieve a future consequence.' " (*People v. Atkins* (2001) 25 Cal.4th 76, 85.)

There is no suggestion in the record that defendant was either unaware of her own actions or that she was prevented by some unforeseen circumstance from completing the intake process required to transition into the rehabilitation program. Accordingly, this case is not like the immigration detention and deportation cases on which defendant relies. (*Cervantes,*

10

*supra,* 175 Cal.App.4th at p. 295–297; *People v. Galvan* (2007) 155 Cal.App.4th 978, 983–984.)

Defendant lastly maintains the trial court erred in imposing the suspended six-year prison sentence. She bases this claim on the trial court's musing that there were three different ways one could view the situation. Defendant asserts it was error for the court to impose the sentence "without deciding which one was correct."

To begin with, the trial court mused that these were only "possible *argument*[*s*]" the parties might have advanced. (Italics added.) Two of these were either suggested or expressly advocated by the prosecution. Only the third—that admission into the rehabilitation program was the basis for defendant's agreement to probation—might have been advanced by the defendant. Further, as to the latter argument, defendant never made the *factual* claim that she agreed to probation, rather than proceeding with immediate execution of the six-year prison sentence, only because she assumed she would be admitted into the rehabilitation program. She therefore has waived any such claim on appeal. (See *Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 [issues not raised in the trial court, which do not present a purely legal question on undisputed facts, cannot be raised for the first time on appeal]; *Royster v. Montanez* (1982) 134 Cal.App.3d 362, 367 [factual issues not presented to the trial court are generally waived on appeal].) Indeed, what the record makes clear is that defense counsel and the trial court made an exceptional effort to avoid what the court had *already made clear* was going to be an aggravated six-year prison term. Thus, as the trial court additionally pointed out, whichever way the case was argued, the result was going to be the same—because the court

11

had suspended *execution* of sentence (and not imposition of sentence), once probation was off the table, defendant was going to serve the six-year term.

Defendant also appears to be claiming the court, after finding a probation violation, failed to exercise its discretion to decide whether to reinstate probation, modify probation, or execute the sentence. The record leaves no doubt, however, as to why the court chose not to reinstate probation. And on this record, the court certainly acted within its discretion in executing on the suspended sentence.

*Failure to Identify Statutory Basis of Fine and Fee*

The trial court imposed a $1,749 fine without specifying the statutory basis for it, in contrast to other fines and fees, which were identified by description or statutory reference.

The Attorney General contends the only fair reading of the record is that this fine was required by Vehicle Code section 23560 which provides, in pertinent part: "If a person is convicted of a violation of Section 23153 and the offense occurred within 10 years of a separate violation of Section 23103 . . . that person shall be punished by imprisonment . . . and by a fine of not less than three hundred ninety dollars ($390) nor more than five thousand dollars ($5,000)." (Veh. Code, § 23560.)

While we agree the $1,749 fine is very likely the statutory fine required under Vehicle Code section 23560, we also agree with defendant the law requires the court to specify the statutory basis for any fine or fee and the abstract of judgment to likewise identify the basis for the fine or fee.

In *People v. Hartley* (2016) 248 Cal.App.4th 620, 636–637 (*Hartley*), for example, the trial court imposed a number of fines and fees, all of which were statutorily identified except a $100 fine. The court reversed and remanded for the trial court to identify the statutory basis for the fine.

12

Citing to *People v. High* (2004) 119 Cal.App.4th 1192, 1200 (*High*), the *Hartley* court explained, " '[a]lthough . . . a detailed recitation of all the fees, fines and penalties on the record may be tedious, California law does not authorize shortcuts. All fines and fees must be set forth in the abstract of judgment.' Moreover, '[a] detailed description of the amount of and statutory basis for the fines and penalty assessments imposed would help the parties and the court avoid errors in this area.' (*People v. Hamed* (2013) 221 Cal.App.4th 928, 939 . . . (*Hamed*).) [¶] . . . *Hamed* recognized several ways for a trial court to perform this duty. 'A trial court could recite the amount and statutory basis for any base fine and the amounts and statutory bases for any penalty assessments on the record, as *High* suggests should be done. (*High, supra,* 119 Cal.App.4th at p. 1200.) Or, in cases where the amounts and statutory bases for the penalty assessments have been set forth in a probation report, a sentencing memorandum, or some other writing, the court could state the amount and statutory basis for the base fine and make a shorthand reference in its oral pronouncement to "penalty assessments as set forth in the" probation report, memorandum, or writing as authorized in (*People v. Sharret* (2011) 191 Cal.App.4th 859 . . . [(*Sharret*)] and *People v. Voit* (2011) 200 Cal.App.4th 1353 . . .).' " (*Hartley, supra*, 248 Cal.App.4th at pp. 636–637, quoting *Hamed,* at pp. 939–940.)

Further, "[a]ll fines and fees must be set forth in the abstract of judgment. [Citations.] The abstract of judgment form . . . provides a number of lines for 'other' financial obligations in addition to those delineated with statutory references on the preprinted form. If the abstract does not specify the amount of each fine, the Department of Corrections cannot fulfill its statutory duty to collect and forward deductions from prisoner wages to the appropriate agency. [Citation.] At a minimum, the inclusion of all fines and

13

fees in the abstract may assist state and local agencies in their collection efforts. (Pen. Code, § 1205, subd. (c).) Thus, even where the Department of Corrections has no statutory obligation to collect a particular fee, . . . the fee must be included in the abstract of judgment." (*High, supra*, 119 Cal.App.4th at p. 1200.) In *Sharret*, the Court of Appeal recognized that "trial courts frequently orally impose the penalties and surcharge . . . by a shorthand reference to 'penalty assessments.' The responsibility then falls to the trial court clerk to specify the penalties and surcharge in appropriate amounts in the minutes and, more importantly, the abstract of judgment." (*Sharret, supra*, 191 Cal.App.4th at p. 864.)

Defendant also complains the trial court did not recite the statutory basis for the $176 probation report fee. There is no doubt this is a probation report fee authorized by Penal Code section 1203.1b, as the court orally stated, and the court minutes describe it as "Prob. Report Fee $ 176." However, for the reasons stated above, on remand, the court's minutes should also specify the statutory basis for this fee, and the abstract of judgment should be corrected as necessary.

*Ability to Pay Hearing*

Defendant lastly maintains the trial court erred in failing to conduct a "*Dueñas*" hearing on her ability to pay before imposing certain fines.

The Attorney General maintains defendant waived this issue given the following colloquy with the court at the time the court imposed, but suspended execution of, sentence:

"[Court:] CCA fee of $90, and COA fee of $120, $176 probation report, and I think that sums it up.

"Do you have any questions, Miss Walker?

"[Defendant]: How does this work out if I don't have money right now?

14

"[Court]: As far as the fines are concerned, I think your question is going to the fines that I've just now imposed?

"[Defendant]: Yes, sir.

"[Court]: If you don't have an ability to pay those fines, I believe all you have to do is go to Alliance One, and they make a payment schedule, which does take into account what you can pay. And I think, you know, is zero, if that's all you can afford to pay. So you've got to make those arrangements with them directly.

"I think for $90, and the $120 fine, those are subject to the discretion of the Court. And if you're saying you have no money, perhaps we can waive that now, instead of setting a hearing. Those two, I think, are discretionary.

"So, Aletha, you can strike that $120 fine. And we'll strike those.

"All right. I think that concludes it. If you have any further questions, Miss Walker, let me know."

Defendant does not take issue with the $176 probation report fee on ability to pay grounds—understandably since the statute requires probation to make that determination in the first instance. (Pen. Code, § 1203.1b, subd. (a).) She does, however, take issue with the $300 restitution fine and $300 probation revocation fine the court subsequently imposed.

Even assuming defendant did not waive her *Dueñas* claim as to these two fines since she was sentenced prior to *Dueñas*, the case is distinguishable.

In *Dueñas*, the defendant was a chronically-ill, unemployed homeless woman with cerebral palsy and a limited education who supported her two children through public aid. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1160–1161.) She had lost her driver's license because of her inability to pay her juvenile citations and then had acquired three misdemeanor convictions for

15

driving without a license because the accumulating fines and fees prevented her from clearing the citations and recovering her license. (*Id*. at p. 1161.) She thus experienced a series of "cascading consequences" because of "a series of criminal proceedings driven by, and contributing to, [her] poverty," and she had already been ordered to pay the charges by the end of her probation period. (*Id*. at pp. 1160, 1163–1164.) The Court of Appeal reversed the challenged assessments, holding "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair [and] imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process. . . ." (*Dueñas,* at p. 1168.) It ordered the trial court to stay the restitution fine "unless and until the People prove that [the defendant] has the present ability to pay it." (*Id*. at pp. 1172–1173.)

Here, defendant has not suffered a series of "cascading consequences" because of a "series of criminal proceedings" which have resulted in her inability to pay the two $300 fines. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056 ["unique concerns addressed in *Dueñas*" were "lacking;" "Nothing establishes or even reasonably suggests that appellants face ongoing unintended punitive consequences."].) Furthermore, she has been sentenced to a lengthy prison term. And while at the time of sentencing, she may have had an inability to pay, nothing in the record indicates she will be ineligible for or unable to perform prison work assignments. One can therefore reasonably infer that an amount sufficient to cover the $600 in fines will be deducted from her prison wages over the course of her time there. (See *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 [court "can infer defendant . . . has the ability to pay the fines and fees

16

imposed upon him from probable future wages, including prison wages"];
*People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140 [any *Dueñas* error was harmless given long prison term and no evidence of inability to work]; see also *People v. Adams* (2020) 44 Cal.App.5th 828, 832 [unlike in *Dueñas,* defendant made no showing of "compelling and extraordinary reasons" pursuant to which trial court has discretion to waive restitution fine under Pen. Code, § 1202.4, subd. (c)].)[1]

## DISPOSITION

The trial court is directed to identify the amounts and statutory bases of the fines, fees, and penalty assessments imposed, in a manner consistent with this opinion, and the abstract of judgment is to be amended or corrected as necessary. In all other respects, the judgment is AFFIRMED.

---

[1] We therefore need not, and do not, weigh in on the correctness of *Dueñas's* reasoning, an issue on which the Supreme Court has granted review. (*People v. Hicks* (2019) 40 Cal.App.5th 320, rev. granted Nov. 26, 2019, S258946; *People v. Kopp* (2019) 38 Cal.App.5th 47, rev. granted Nov. 13, 2019, S257844.)

17

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Margulies, J.

A155507, People v. Walker

18