Filed 2/16/23  P. v. Macovichuk CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D079774 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN411078) |
| MICHAEL ELLIOTT MACOVICHUK, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Brad A. Weinreb and James E. Simmons, Jr., Judges.  Sentence vacated in part and remanded for further proceedings; in all other respects affirmed.

Kenneth J. Vandevelde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Michael Elliott Macovichuk guilty of one count of making a criminal threat. (Pen. Code, § 422.)[1] The trial court placed Macovichuk on formal probation for a term of three years.

Macovichuk asserts several arguments on appeal. First, he contends that his constitutional right to a speedy trial, under both the federal and state constitutions, was violated because pandemic-related delays resulted in a time span of 19 months between the time he was charged and the date of his trial, during which one of his intended trial witnesses died. Second, he contends that the trial court abused its discretion in overruling an evidentiary objection to the admission of certain photographs. Third, he challenges the imposition of certain fines and fees on the ground that they were not imposed by the trial court, on the record, at the sentencing hearing. Finally, he challenges the imposition of certain probation conditions.

We conclude that Macovichuk's only meritorious challenge relates to the imposition of the fines and fees. As the People concede, the trial court was not clear during the sentencing hearing about which fines and fees it intended to impose and in what amounts. Accordingly, we will vacate the imposition of the fines and fees specified in the minute order from the sentencing hearing and the order granting formal probation, and we will remand for the trial court to hold further proceedings with respect to the fines and fees it intends to impose.

I.

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of February 21, 2020, Macovichuk was speaking on the phone to his brother, J., who was in Houston. As J. described the phone call

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

during his trial testimony, Macovichuk became upset, saying that everyone was against him and that "nothing matters in life." Macovichuk threatened to harm himself and then started saying that he was going to kill other people. As the intended victims, Macovichuk specifically named his mother (Mother) and everyone else who was at Mother's house, which included two of Macovichuk's nephews, and Macovichuk's sister and her family. Macovichuk also said he was going to kill Tim F., in whose house Macovichuk was residing.

At first, J. did not believe the threats, but then Macovichuk stated that he had a gun, and he told J. to listen to a sound, which J. identified as the sound of loading bullets into the magazine of a gun. At some point during the conversation, Macovichuk told J. that he had rifles. Macovichuk repeatedly said there would be dead people, and kept reiterating that he was going to act. Macovichuk was aggressive and yelling. Macovichuk told J. that it was J.'s choice, "It's either 30 people or one," which J. understood to mean that Macovichuk was either going to shoot 30 people or shoot himself.

J.'s telephone conversation with Macovichuk lasted approximately 40 minutes and ended when Macovichuk hung up on J. During much of that time, J. was communicating by text message with Mother. J. urged Mother to call 911, and she did so. In his text messages to Mother, J. warned Mother about Macovichuk's threats to her and others, kept her updated on Macovichuk's statements, and worked with her to determine where Macovichuk might be located. In addition, both Mother and J. attempted to contact Tim F. to warn him of Macovichuk's threats.

Based on statements that Macovichuk made during their conversation, J. inferred that Macovichuk was at a storage facility where he had a storage unit. After J. and Mother figured out the likely location of the storage

3

facility, which was about 10 miles from Mother's house, police responded to that location and contacted Macovichuk in the parking lot. Macovichuk did not have any weapons on his person or in his car. However, when police searched Macovichuk's storage unit, they found a loaded pistol and two loaded rifles.

Macovichuk was arrested on February 21, 2020. On February 25, 2020, Macovichuk was arraigned on a complaint charging him with one count of making a criminal threat. The complaint identified Mother as the victim of the threat.

A preliminary hearing was held on May 19, 2020, at which Macovichuk was arraigned on the information.[2] On the day of the preliminary hearing, Macovichuk was released from custody on bail. A readiness hearing was held on June 16, 2020, with trial set for July 8, 2020.

With Macovichuk's agreement to a time waiver, the trial date was continued to September 23, 2020, and then to October 28, 2020. Thereafter, the disruptions related to the COVID-19 pandemic caused the trial court to continue the trial date nine times between October 28, 2020, and August 25, 2021, without obtaining a time waiver from Macovichuk, and over his objection. On September 14, 2021, Macovichuk requested a continuance of the trial date.[3]

---

[2] At a March 4, 2020 readiness hearing, Macovichuk waived time, and a preliminary hearing was scheduled to take place on April 14, 2020. Because of pandemic-related disruptions, that hearing was continued to May 19, 2020. Macovichuk filed a motion to dismiss based on the delay in holding the preliminary hearing, which the trial court denied.

[3] A pleading filed by Macovichuk in the trial court stated that the request for a continuance was "due to COVID quarantine and car trouble."

4

A jury trial commenced on October 6, 2021. On the day of trial, the People amended the information to add a second count alleging the making of a criminal threat (§ 422) with J. as the victim.[4] Also on the day of trial, the trial court considered and denied Macovichuk's motion to dismiss the action based on an alleged denial of his right to a speedy trial.[5]

The jury convicted Macovichuk on one count of making a criminal threat, with J. as the victim, but it was unable to reach a verdict on the count alleging that he made a criminal threat against Mother. A mistrial was declared on that count, and the People subsequently dismissed it.

The trial court placed Macovichuk on formal probation for a period of three years.

## II.

## DISCUSSION

A.   *Macovichuk's Right to a Speedy Trial Was Not Violated*

We first consider Macovichuk's contention that his conviction must be reversed because he was denied the right to a speedy trial as guaranteed by the federal Sixth Amendment and the California Constitution.

1.   *Relevant Factual Background*

We begin with the factual basis for Macovichuk's argument. As we have explained, Macovichuk was arrested and arraigned in late February 2020, and his trial started more than 19 months later in early October 2021.

---

[4]   Although there was no evidence that Macovichuk threatened to injure J., section 422 makes it a crime to threaten the safety of a person's immediate family members, including a parent. (§ 422, subds. (a), (b).)

[5]   The trial court denied the motion to dismiss without prejudice so that Macovichuk could renew it at the end of trial. Macovichuk renewed the motion at the end of trial, and the trial court again denied it.

As the People point out, some of the 19-month delay was agreed to by Macovichuk, as he waived time for the continuance of the trial dates from July 8 to October 28, 2020, and from September 14 to October 6, 2021. However, it is undisputed that the approximate 11-month delay between October 28, 2020 and September 14, 2021 was due to the disruption to the trial court's operations caused by the COVID-19 pandemic. Macovichuk repeatedly objected to that 11-month delay, and he thereafter brought a motion to dismiss based on the denial of his right to a speedy trial.

During the entire 11 months that the trial court delayed Macovichuk's trial, general orders were in place that extended the deadline to hold a criminal trial due to the exceptional circumstance of the COVID-19 pandemic.[6] Moreover, as the San Diego Superior Court began again to hold criminal trials as the pandemic subsided, the court's general orders prioritized trials for *in-custody* defendants, rather than *out-of-custody* defendants like Macovichuk.[7] As the trial court explained in ruling on

---

[6] On our own motion, we take judicial notice of the general orders of the presiding department of the San Diego County Superior Court which extended the deadline to hold criminal trials due to the pandemic during the timeframe when Macovichuk's trial was delayed over his objection. (Super. Ct. San Diego County, Gen. Order Nos. 100720-95 (Oct. 7, 2020), 110520-101 (Nov. 5, 2020), 120820-109 (Dec. 8, 2020), 010121-48 (Dec. 31, 2020), 010821-52 (Jan. 8, 2021), 020321-56 (Feb. 3, 2021), 031021-60 (Mar. 10, 2021), 040821-65 (Apr. 8, 2021), 050621-69 (May 6, 2021), 060721-73 (June 7, 2021), 070821-78 (July 8, 2021), 080621-82 (Aug. 6, 2021), 090221-85 (Sept. 2, 2021).)

[7] On our own motion, we take judicial notice of the general orders of the presiding department of the San Diego County Superior Court that gave priority to criminal trials for in-custody defendants during the time period that Macovichuk's trial was continued over his objection. (Super. Ct. San Diego County, Gen. Order Nos. 010121-44 (Dec. 31, 2020), 072721-80 (July 27, 2021).)

6

Macovichuk's motion to dismiss on October 6, 2021, "When we restarted the conduct[ing] of trials, I think there were some limited trials that were being done for in-custody defendants only because they are prioritized in that way, and I think it's only been in the last month or two that we in the county have started doing out-of-custody trials."

In the trial court, in an attempt to establish that the delay of his trial caused him to suffer prejudice, Macovichuk presented evidence that one of his intended defense witnesses, Tim F., died on January 23, 2021, while Macovichuk was awaiting trial. Macovichuk explained in his motion to dismiss that he "would have called [Tim F.] to 1) testify that [J.] did not say that [Macovichuk] threatened [Mother] . . . or their family, and 2) testify that [J.] is sneaky and lies." On the first point, the motion to dismiss explained, "[Tim F.] gave a statement to a deputy that on February 21, 2020, [J.] called him and said he needed to leave his house right away and that [Macovichuk] threatened to 'kill 30 people and he ([Tim F.]) was one of them.' [¶] [Tim F.] did not say [J.] said [Macovichuk] threatened to kill [J.]. [Tim F.] did not say [Macovichuk] threatened to kill anyone from [J.'s] family." On the second point, the motion explained that, based on an interview with Tim F.'s mother, Linda F., Tim F. believed "that [J.] is sneaky and he lies."[8]

In denying the motion to dismiss, the trial court explained that the testimony Macovichuk would have presented through Tim F. was not material to Macovichuk's defense. The trial court stated, "[T]he fact that there are purported threats made to specific individuals and then those threats are not necessarily communicated to this witness, [Tim F.], doesn't

---

[8]    Defense counsel submitted a declaration setting forth his understanding of the statement that Tim F. gave to law enforcement and describing the statements that Linda F. made during an interview.

necessarily mean or doesn't have any real impact or effect on whether or not those threats were made to these other witnesses." The trial court concluded, "I don't necessarily think it's material, nor very probative, as to the issue as to whether or not the threats were made to these other individuals."

2.    *Applicable Legal Standards*

"A criminal defendant's right to a speedy trial is guaranteed by the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution. 'The California Legislature has "re-expressed and amplified" these fundamental guarantees by various statutory enactments, including Penal Code section 1382.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 552-553.)[9] "[A] defendant may claim a violation of the state Constitution's speedy trial right based on delay not covered by any statutory speedy trial provision." (*People v. Martinez* (2000) 22 Cal.4th 750, 766 (*Martinez*).)

With respect to the standard of review applicable to constitutionally-based speedy trial challenges, the People's appellate brief does not address the issue. Macovichuk argues that we should apply the de novo standard of review used to evaluate mixed questions of law and fact that arise in the context of constitutional issues. (See *People v. Cromer* (2001) 24 Cal.4th 889,

_____

[9]    Section 1382 generally provides that, unless good cause to the contrary is shown or a waiver is obtained from the defendant, the court shall dismiss a felony prosecution that is not brought to trial within a 60-day statutory deadline after arraignment. On appeal, Macovichuk does not premise his speedy trial challenge on any statutory violation. Indeed, this court's recent opinion in *Elias v. Superior Court* (2022) 78 Cal.App.5th 926, 941 (*Elias*) precludes such an argument. In *Elias* we explained that because of "[t]he series of emergency orders from the Chief Justice and the San Diego Superior Court" that "extended the section 1382 period to commence trials for criminal defendants due to the COVID-19 pandemic," the time to bring the defendant to trial under section 1382 had not expired, and there was accordingly no violation of his statutory right to a speedy trial. (*Ibid.*)

8

894, 901 [noting the "usual practice" of applying independent review, de novo review "for review of mixed question determinations affecting constitutional rights"]; *U.S. Bank Nat. Assn. ex rel. CWCapital Asset Management LLC v. Village at Lakeridge, LLC* (2018) __ U.S. __, __ [138 S.Ct. 960, 967, fn. 4] [noting that "[i]n the constitutional realm" the court has "often held that the role of appellate courts 'in marking out the limits of [a] standard through the process of case-by-case adjudication' favors *de novo* review even when answering a mixed question primarily involves plunging into a factual record"].) That approach is consistent with the practice in the federal courts when reviewing Sixth Amendment speedy trial challenges. (See, e.g., *U.S. v. Molina-Solorio* (5th Cir. 2009) 577 F.3d 300, 304 [concluding that a federal constitutional speedy trial challenge presents a mixed question of law and fact, and citing five other federal circuits reaching the same conclusion]; *U.S. v. Tchibassa* (D.C. Cir. 2006) 452 F.3d 918, 924.) As the People do not expressly oppose the de novo standard of review advocated by Macovichuk, and because our application of that standard is not outcome determinative in this case, for the purpose of our analysis we will assume, without deciding, that a de novo standard of review applies.[10]

As the analysis for a speedy trial challenge differs in certain respects between the state and federal constitutions, we proceed to consider each in turn.

_____

[10] Our Supreme Court has not recently addressed the standard of review that applies to constitutionally-based speedy trial challenges. Older case law noted a substantial evidence standard and did not consider whether a mixed question of law and fact might be appropriate. (See, e.g., *People v. Mitchell* (1972) 8 Cal.3d 164, 167 [applying a substantial evidence standard of review to the question of whether "defendant was deprived of his right to a speedy trial and was prejudiced thereby" (italics omitted)]; *People v. Hill* (1984) 37 Cal.3d 491, 499 [same].)

### a.  *Federal Constitutional Challenge*

"For the federal Constitution's speedy trial right, the United States Supreme Court has articulated a balancing test that requires consideration of the length of the delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defense caused by the delay." (*Martinez, supra*, 22 Cal.4th at p. 755, citing *Barker v. Wingo* (1972) 407 U.S. 514, 530 (*Barker*), italics omitted.)  "When the delay is of sufficient length to be presumptively prejudicial, any actual prejudice is balanced with the other *Barker* factors, including the justification for the delay." (*Elias, supra*, 78 Cal.App.5th at p. 938.)

The Supreme Court has observed that "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." (*Doggett v. U.S.* (1992) 505 U.S. 647, 652, fn. 1 (*Doggett*).)  Here, the approximate 11-month delay experienced by Macovichuk "approaches one year." (*Ibid.*)  We will accordingly assume, for the sake of our analysis, that Macovichuk has shown *presumptive* prejudice.  We therefore proceed to conduct a balancing of any *actual* prejudice with the other *Barker* factors. (*Elias, supra*, 78 Cal.App.5th at p. 938.)

As we have explained, the four *Barker* factors are "the length of the delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defense caused by the delay." (*Martinez, supra*, 22 Cal.4th at p. 755.)  "None of these four factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant.' [Citation.]  'The burden of demonstrating

a speedy trial violation under *Barker*'s multifactor test lies with the defendant.' " (*People v. Bradley* (2020) 51 Cal.App.5th 32, 41 (*Bradley*).)

With respect to the first factor, i.e., the length of the delay, we consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." (*Doggett, supra*, 505 U.S. at p. 652.) Because "the presumption that pretrial delay has prejudiced the accused intensifies over time" (*ibid.*), "in ways that neither party can prove or, for that matter, identify" (*id.* at p. 655), it is significant when the "delay before trial was uncommonly long" (*id.* at p. 651). Here, because the approximate 11-month delay does not in any sense "stretch[ ] beyond the bare minimum needed to trigger judicial examination of the claim" (*id.* at p. 652), it cannot reasonably be described as "uncommonly long" (*id.* at p. 651), and thus does not meaningfully contribute to the finding of a speedy trial violation under the *Barker* factors.

"In applying the second factor, the reason for the delay, the United States Supreme Court has asked, 'whether the government or the criminal defendant is more to blame for th[e] delay.' [Citation.] A delay meant to hamper the defense weighs heavily against the prosecution, while more neutral reasons such as negligence or overcrowded courts weigh less heavily." (*Bradley, supra*, 51 Cal.App.5th at p. 41.) Here, the undisputed reason for the delay was the COVID-19 pandemic. As we explained in *Elias*, "[c]ourts have recognized that '[h]ealth quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date.' [Citations.] ' "A contrary holding would require trial court personnel, jurors, and witnesses to be exposed to debilitating and perhaps life-threatening illness. Public health concerns trump the right to a speedy trial." ' " (*Elias, supra*, 78 Cal.App.5th at p. 942.) In the context of the COVID-19 pandemic,

11

*Elias* observed, "The backlog here was not a routine or chronic condition for the court. The COVID-19 pandemic has been a ' "unique, nonrecurring event[ ]" ' which ' "ha[s] produced an inordinate number of cases for court disposition." ' [Citation.] Although the continuances in this case have been lengthy, the COVID-19 pandemic has been 'of such severity as to justify' the continuance." (*Id*. at p. 941.) As in *Elias*, "[w]e acknowledge the 'unfortunate hardship to defendant' from the delays in this case, but, . . . 'neither the prosecution nor the court is responsible for the emergency that has overwhelmed the nation and much of the world.' " (*Id*. at p. 942.) As in *Elias*, we accordingly conclude that the COVID-19 pandemic constituted good cause for the delay of Macovichuk's trial.[11]

---

[11] Macovichuk does not dispute that the COVID-19 pandemic was a serious situation, out of the control of the courts and the People, that caused the delay of his trial. However, he represents in his opening appellate brief that "[a]lthough the COVID-19 pandemic was a public health crisis, out-of-custody trials were occurring in [downtown] San Diego as early as December 2020," referring to one of the San Diego County Superior Court's courthouses. He argues that "the record contains no justification for why an out-of-custody trial could not have been held in [the] Vista [courthouse]," where his case was assigned, during that time frame as well. Defense counsel attempted to "note . . . for the record" during the October 6, 2021 hearing that "it's my understanding that even as of December of 2020, at least downtown San Diego was doing in-custody trials," but the trial court rejected that statement. The trial court corrected defense counsel by stating, "When we restarted the conducti[ng] of trials, I think there were some limited trials that were being done for in-custody defendants only because they are prioritized in that way, and I think it's only been in the last month or two that we in the County have started doing out-of-custody trials." Moreover, as we have explained, the general orders of the San Diego County Superior Court that were in force during the period that Macovichuk's trial was delayed set forth a policy of giving priority to trials of in-custody defendants. (See fn. 7, *ante*.) Therefore, we conclude there is no support for Macovichuk's argument that, even in light of the pandemic, his out-of-custody trial reasonably could have been conducted at an earlier date.

"In assessing the third *Barker* factor (i.e., defendant's assertion of his speedy trial right), we note 'the weight ascribed to complaints of pretrial delay ordinarily depends upon their frequency and force.' " (*Bradley*, *supra*, 51 Cal.App.5th at p. 42.) Here, the People acknowledge that Macovichuk repeatedly asserted his right to a speedy trial and brought a motion to enforce his rights.

"For the fourth and final *Barker* factor, prejudice to the defendant, we must consider the circumstances of this case in light of the interests the speedy trial right is intended to protect. [Citation.] Those interests, as identified by the United States Supreme Court, are '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' " (*Bradley*, *supra*, 51 Cal.App.5th at p. 43.) "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past." (*Barker*, *supra*, 407 U.S. at p. 532.) Macovichuk focuses on the third of these interests. As he did in the trial court during his motion to dismiss, Macovichuk contends that his defense was impaired because Tim F. died before he could testify at trial. Macovichuk contends that he would have called Tim F. as a witness to testify about (1) the message that J. left for Tim F. about Macovichuk's threat toward him, and (2) Tim F.'s opinion that J. "is sneaky and lies."

With respect to the first subject to which Tim F. would have testified, we concur with the trial court that the testimony would not have been material to Macovichuk's defense. Defense counsel's declaration stated that Tim F. "gave a statement to a deputy that on February 21, 2020, [J.] called

13

him and said he needed to leave his house right away and that [Macovichuk] threatened to 'kill 30 people and he ([Tim F.]) was one of them.'" In Macovichuk's view, it is significant that J. did not identify Mother or the people in Mother's house as among the 30 people that Macovichuk had threatened to kill.

We are not persuaded that J.'s failure to specifically identify Mother and the people in Mother's house in his message to Tim F. is a fact that would have materially helped the defense. The purpose of J.'s call to Tim F. was to warn Tim F. that Macovichuk had threatened to kill him. There was no reason for J. to have specifically identified the other 30 people whom Macovichuk had threatened to kill if the purpose of the call was to provide a warning to Tim F. about the danger that he faced from Macovichuk. Therefore, the lack of any specific mention in the message of Macovichuk's threat to Mother and the people in Mother's house does not tend to prove that those people were not among the 30 people that Macovichuk threatened. If anything, evidence of J.'s message to Tim F. would have bolstered the People's case, as the content of the message was consistent with J.'s testimony and text messages to Mother, stating that Macovichuk had threatened to kill 30 people. The evidence of the message also would have tended to prove that J. believed Macovichuk's threat was serious and posed an immediate risk, as he took action to warn Tim F. about it. (§ 422, subd. (a) [a threat is criminal if, among other things, it "is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat"].)

With respect to the second subject that Tim F. would have addressed in his testimony, defense counsel's declaration stated, "[Tim F.] would also have testified that [J.] is sneaky and lies. [Tim F.'s] mother Linda was interviewed

14

and she said she heard from her son that [J.] is sneaky and he lies." Defense counsel did not provide any further explanation of the foundation that Tim F. would have for this testimony, such as any personal interactions with J. At trial, although the defense was not able to call Tim F. to testify that J. "is sneaky and lies," the defense called Tim F.'s mother, Linda F., to give testimony on that subject. Linda F. testified that she was acquainted with J. because Tim F. had worked for J. on two occasions. She also testified that, in her opinion, J. is "very dishonest" and has a reputation for being "sneaky." Linda F. described specific instances to support her testimony, including that J. cheated Tim F. out of commissions that were due to him, which she knew about because she participated in a phone call with J. to discuss the subject. She also testified that she saw emails that "didn't align" with what J. had told her. Further, Linda F. testified that J. did not pay Tim F. for hotel rooms needed for work-related travel after promising to do so.

Macovichuk explains that he would have relied on Tim F.'s testimony that J. "is sneaky and lies" to argue that the jury should not believe J.'s testimony about what Macovichuk said during their telephone conversation. However, in our view, Macovichuk was not materially prejudiced due to the absence of Tim F.'s testimony on that subject. First, as we have explained, Linda F. gave much of the same testimony that Tim F. would have given. Based on her knowledge of Tim F.'s work-related disputes with J., Linda F. was able to testify both that J. is sneaky and that he is dishonest. The testimony on that subject might possibly have had more force had it come from Tim F. directly, as he was the person who was engaged in the work-related disputes with J., but Linda F. was nevertheless able to provide testimony on the same subject that Tim F. would have covered and was able to support that testimony with specific examples. Second, whether or not

15

offered through Tim F. or Linda F., evidence that J. is sneaky and lies with respect to work-related matters, is only tangentially relevant to the issue of whether J. would have invented a story about Macovichuk threatening to kill multiple people. The scenario of someone allegedly cheating an employee out of compensation, although troublesome, is very different from the scenario of someone claiming that a brother is making threats to kill a friend and members of his own family.

Based on the four *Barker* factors that we have discussed above, we conclude that in light of the minimal prejudice identified by Macovichuk, weighed against the good cause for the delay arising from the COVID-19 pandemic, Macovichuk has not established that he was deprived of his federal constitutional right to a speedy trial.

b.      *State Constitutional Challenge*

In a speedy trial challenge based on the California constitution, "[t]he defense has the initial burden of showing prejudice from a delay in bringing the defendant to trial. Once the defense satisfies this burden, the prosecution must show justification for the delay. If the prosecution does that, the trial court must balance the prejudice to the defendant resulting from the delay against the prosecution's justification for the delay." (*People v. Lowe* (2007) 40 Cal.4th 937, 942.)

Here, Macovichuk's challenge under the California constitution fails at the first step. As we have discussed above, although Macovichuk contends he was prejudiced by his inability to call Tim F. to testify, Macovichuk has not established that the absence of Tim F.'s testimony was prejudicial.

Even were we to assume for the sake of our analysis that Macovichuk established he was prejudiced, at least to some extent, by the delay in bringing his case to trial, the COVID-19 pandemic constituted good cause for

16

the delay, as we have already discussed. In balancing any minimal prejudice that Macovichuk may have incurred against the good cause for the delay, we conclude that Macovichuk has not established a violation of his right to a speedy trial under the California Constitution.

B.  *The Trial Court Did Not Abuse Its Discretion by Overruling Macovichuk's Objection to the Admission of Photographs of the Firearms Found in His Storage Unit*

During motions in limine, defense counsel objected to the admission of photographs of the three loaded firearms that law enforcement located in Macovichuk's storage unit. The objection was based on several grounds, including that the evidence should be excluded as more prejudicial than probative pursuant to Evidence Code section 352. The trial court overruled the objection. Defense counsel renewed the objection at the end of trial when objecting to the admission of the photographs into evidence, and the trial court again overruled it.

At trial, during the testimony of the deputy who participated in the search of Macovichuk's storage unit, the People showed the jury nine photographs related to the three firearms that were found in the storage unit. After the People established through the deputy's testimony that he "discovered two rifles and a pistol" in the storage unit and took photographs of them, the People went through the photographs one by one while the deputy described what was depicted in each of them.[12]

---

[12]  As Macovichuk's appellate brief points out, for reasons that are unclear, the exhibit numbers used by counsel when referring to the photographs during trial were one number off from the exhibit numbers that are marked on the photographs themselves as they appear in the appellate record. In describing the exhibits, we refer to the numbers marked on the photographs in the appellate record.

Exhibits 14 through 16 concern the pistol found in the storage unit. Specifically, Exhibit 14 is a photograph of the inside of the storage unit, showing a *closed* black case sitting on top of some other items. As the deputy testified, the black case "contained the 9mm pistol." Exhibit 15 is a photograph taken inside the storage unit showing an *open* black case, with a pistol inside. The deputy testified that the photograph depicted the inside of the black case shown in Exhibit 14. Exhibit 16 is a photograph taken inside the storage unit of a pistol and its loaded magazine lying *next to* an open black case. The deputy testified that the pistol and the loaded magazine were taken from the black case.

Exhibits 17 through 19 concern the two rifles found in the storage unit. Specifically, Exhibit 17 is a photograph of the inside of the storage unit with a white cloth bag nestled among other items. The deputy testified that the white cloth bag contained rifles. Exhibit 18 depicts a rifle lying on top of the white cloth bag inside the storage unit. The deputy testified that the rifle in the photograph was one of the rifles he found inside the white cloth bag. Specifically, it was "a World-War-II style firearm." Exhibit 19 depicts a visibly different rifle lying on top of the white cloth bag inside the storage unit. The deputy testified that it was a Remington-style rifle.

The last three photographs, Exhibits 20 through 22, depict the three firearms, each depicted individually, after they were taken to the police station and marked with evidence tags. The deputy made clear in his testimony that the photographs depicted the pistol and the two rifles found in the storage unit and that the photographs were taken at the police station.

Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time

18

or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) In applying section 352, the trial court enjoys " 'broad discretion,' " and " '[a] trial court's discretionary ruling under . . . section 352 will not be disturbed on appeal absent an abuse of discretion.' " (*People v. Clark* (2016) 63 Cal.4th 522, 586.) " ' "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 26.)

Macovichuk contends that, under Evidence Code section 352, the trial court abused its discretion in overruling his objection to the admission into evidence of the photographs depicting the firearms because they were not probative of any disputed issue, and they were unduly prejudicial.

With respect to the probative value of the photographs, Macovichuk argues that the only relevant photograph was Exhibit 16. According to Macovichuk, because that exhibit depicted the loaded pistol inside the storage unit, it was "probative of whether [J.] heard the loading of a handgun magazine," but none of the other photographs of the pistol were relevant. With respect to the photographs of the rifles, he argues that because it was undisputed that the rifles were found in the storage unit, none of the photographs of the rifles were "probative of any disputed fact and . . . were not relevant." We are not persuaded by Macovichuk's contention that the photographs lacked probative value.

19

As an initial matter, contrary to Macovichuk's contention, the People are not limited to proving their case through live testimony. Photographs and other visual aids that relate to and depict subject matter described in witness testimony constitute relevant probative evidence. (*People v. Scheid* (1997) 16 Cal.4th 1, 14 ["a photograph need not be excluded as cumulative if offered to prove facts established by testimony"].) "[I]t is immaterial for purposes of determining the relevance of evidence that other evidence may establish the same point." (*Id.* at p. 16.) " ' "[T]he prosecution [is] not obliged to prove . . . details solely from the testimony of live witnesses . . . ." ' " (*People v. Jackson* (1996) 13 Cal.4th 1164, 1216.)

Moreover, the photographs establishing the location of the loaded pistol and the rifles inside Macovichuk's storage unit were relevant for multiple reasons. For one thing, they corroborated J.'s testimony about what Macovichuk said during their conversation, namely, that he had guns, including rifles, and he was loading them. In addition, the location of the firearms in the vicinity of where Macovichuk was arrested shortly after his conversation with J. is probative of whether, as required for the crime of making a criminal threat, J.'s fear was reasonable under the circumstances, and whether Macovichuk had the specific intent that his statements be taken as a threat. (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 [elements of making a criminal threat in violation of § 422].) Moreover, the multiple photographs of the pistol inside the storage unit were not merely cumulative of one another. Instead, by showing the *closed* black case, the pistol *inside* the open black case, and then the pistol *beside* the open black case with the loaded magazine, they provided a visual demonstration of where the pistol was found, how it was stored, and the fact that it was loaded. The photographs taken at the police station were valuable as a separate matter

20

from the photographs taken at the storage unit because they were of significantly better quality, allowing the jury to get an accurate view of each of the firearms.

With respect to the undue prejudice associated with the photographs, Macovichuk argues that "[t]he prosecution's introduction of these gratuitous, repetitive, irrelevant photographs of guns was intended . . . to depict Mr. Macovichuk as 'some type of gun nut' and to create an emotional bias against Mr. Macovichuk." He contends that "once in the jury room, with so many photographs of guns, the jury might well have become confused and believed that the locker contained three handguns and five rifles." We are not persuaded. As we have described, the deputy's testimony was very clear that only one pistol and two rifles were found in the storage unit. In addition, the prosecutor was very careful and methodical in going through each of the photographs during the deputy's testimony to allow him to explain exactly what they depicted. A reasonable juror viewing the photographs after listening to the deputy's testimony would not be confused about how many guns were found in Macovichuk's storage unit. Therefore, the admission into evidence of the nine photographs relating to the firearms did not pose a risk of portraying Macovichuk as "some kind of gun nut" who owned more than three firearms.

We accordingly conclude that the trial court was well within its discretion to overrule Macovichuk's objection to the photographs based on Evidence Code section 352, as it could reasonably conclude that the probative value of the photographs was not outweighed by any undue prejudice.

C.   *Macovichuk's Challenge to the Fines and Fees Set Forth in the Sentencing Minute Order and the Order Granting Formal Probation*

We next consider Macovichuk's challenge to the fines and fees set forth in the minute order from the sentencing hearing and the order granting formal probation. Macovichuk contends that those orders are inconsistent with the fines and fees imposed by the trial court on the record at the sentencing hearing. According to Macovichuk, we should order that the sentencing minute order and the order granting formal probation be corrected to reflect the trial court's pronouncements at the sentencing hearing regarding the imposition of fines and fees.

1.   *Applicable Legal Standards*

There are "two different aspects of the sentencing process: (1) the oral pronouncement of judgment by the sentencing judge, and (2) the preparation of the abstract of judgment by the court clerk." (*People v. Hamed* (2013) 221 Cal.App.4th 928, 938.) As for the oral pronouncement, "a sentencing court should make a 'detailed recitation of all the fees, fines and penalties on the record.' " (*Ibid.*) The purpose of this is to help the parties and the court identify and correct errors in fines and fees at the trial court level, avoiding unnecessary appeals. (*Id.* at pp. 939-940.) "[S]uch a detailed recitation 'may be tedious,' but . . . 'California law does not authorize shortcuts.' " (*Id.* at p. 939.)[13] "[F]ailure to specify the amount and statutory basis for each fine, fee, and penalty assessment is a 'legal error[ ] at sentencing' that can be

---

[13]   Case law has recognized that the trial court may use certain shorthand references in specifying the fines and fees, including making reference to the amounts set forth " 'in a probation report, a sentencing memorandum, or some other writing.' " (*People v. Hartley* (2016) 248 Cal.App.4th 620, 637 (*Hartley*).)

22

reviewed on appeal ' "regardless of whether an objection or argument was raised." ' " (*Hartley*, *supra*, 248 Cal.App.4th at p. 637.)

"The oral imposition of sentence constitutes the judgment in an action, and the minutes cannot add anything substantive to the oral pronouncement. [Citations.] Generally, the oral pronouncement controls if there is a discrepancy, and the court clerk lacks the authority to add fines or fees not imposed by the trial court. [Citation.] 'The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment. [Citation.] . . . [T]he clerk's minutes must accurately reflect what occurred at the [sentencing] hearing.' [Citation.] If the clerk includes fines in the court's minutes or the abstract of judgment that were not part of the oral pronouncement of sentence, those fines must be stricken from the minutes and the abstract of judgment." (*People v. Bongani El* (2021) 65 Cal.App.5th 963, 967 (*Bongani El*).)

2.      *Relevant Proceedings*

At the sentencing hearing on November 10, 2021, defense counsel asked the trial court to consider reducing Macovichuk's conviction to a misdemeanor because a felony conviction would likely cause Macovichuk to lose his work-related licenses and would therefore make it harder for Macovichuk to support himself while on probation.[14] Defense counsel also asked that the applicable fines and fees "either be lowered, waived, minimized, applied credit, time served in custody to delete them or at least stay them upon an ability to pay hearing." The trial court declined to reduce the conviction to a misdemeanor, but it stated that with respect to the fines

---

[14]    Defense counsel represented that Macovichuk had a real estate license, a license to sell insurance, a license to sell security systems, and a "mortgage license."

and fees, "[t]o the extent the court has the ability to stay or reduce or vacate, I will."

Specifically, the trial court stated the following as it went through the Judicial Council form for the order granting formal probation:[15]

> "Fines and fees. To the extent the court has the ability to stay or reduce or vacate, I will. I don't know—I don't believe I have any ability to reduce or stay the restitution fines under [sections] 1202.4 and 1202.44. [Section] 1202.44 is the PRRF [probation revocation restitution fine]. That's suspended unless probation is [revoked]. [¶] . . . [¶]

> "To the extent the court can vacate or credit against the fines for the court operations assessment fee or the criminal conviction assessment fee, that would be my order to do so. To the extent I can't, that plus the restitution fines will be paid."

This is the only statement that the trial court made about its imposition of fines and fees on the record at the sentencing hearing. The trial court did not specify which fines and fees it concluded it had the discretion to reduce or vacate, and it did not specify the amount for any of the fines or fees. It also did not specifically refer to any other document, such as the probation officer's report, in order to incorporate the monetary amounts for the fines and fees set forth therein.

Following the sentencing hearing, the trial court issued a minute order from the sentencing hearing and an order granting formal probation, both of

---

15    It is apparent from our review of the clerk's transcript that the trial court's order granting formal probation was based on the suggested order submitted by the probation officer, with certain edits made by the trial court as to specific items.

24

which set forth the following fines and fees: a fine of $820;[16] a criminal conviction assessment of $30 (Gov. Code, § 70373); a court operations assessment of $40 (§ 1465.8); a restitution fine of $300 (§ 1202.4, subd. (b)) plus a $30 collection fee (§ 1202.4, subd. (l)); and a suspended probation revocation restitution fine of $300 (§ 1202.44).

    3.    *Remand Is Required for the Trial Court to Clarify, on the Record, Its Intent Regarding the Fines and Fees*

Macovichuk argues that because the oral pronouncement of sentence controls (*Bongani El*, *supra*, 65 Cal.App.5th at p. 967), the minute order and the order granting formal probation improperly ordered fines and fees that the trial court did not impose during the sentencing hearing. Macovichuk specifically contends that the $820 base fine and penalty assessment were improperly imposed in the sentencing minute order and the order granting formal probation because the trial court did not mention *any* base fine or penalty assessment during the sentencing hearing. Further, with respect to the rest of the fines and fees (which the trial court at least mentioned by category at the sentencing hearing), he contends that they are all fines and fees that the trial court had the discretion to decline to impose, and that therefore, the minute order and the order granting formal probation are in

---

[16]     Although the trial court did not mention the $820 fine during the sentencing hearing, Macovichuk's appellate brief explains the probable legal basis for the $820 fine: "Even if it had been mentioned by the court, the $820 fine presumably was based on a $200 base fine pursuant to . . . section 672, plus enhancements pursuant to other statutes. (. . . § 1464; . . . § 1465.7; Gov. Code § 70372; Gov. Code § 76000; Gov. Code § 76000.5; Gov. Code § 76104.6; Gov. Code § 76104.7.)" A worksheet in the probation officer's report states that the $820 was composed of a $200 base fine, a $580 penalty assessment, and a $40 state surcharge.

conflict with the trial court's oral pronouncement that it would reduce or vacate them "[t]o the extent the court ha[d] the ability" to do so.[17]

The People take the position that the trial court's oral pronouncement regarding the fines and fees was *unclear* as to which fines and fees it meant to impose and in what amounts, not that the trial court indicated that it would decline to impose any of them. According to the People, "here there is a lack of clarity rather than a discrepancy. . . . Thus, the court's imprecise oral pronouncement is not in conflict with the minute order and the probation order. However, clarification by the court is needed." The People state that "[b]ecause it is unclear from the trial court's oral pronouncement what fees and fines, if any, it imposed, and on what basis it may have stricken any, the matter should be remanded for the court to clarify its ruling, and for [Macovichuk] to raise any related arguments he may have."

We concur with the People's assessment of the record. There is no direct conflict between the oral pronouncement at the sentencing hearing and the subsequent minute order and order granting formal probation. Instead of indicating that it would decline to impose all of the fines and fees, the trial court was *unclear* at the sentencing hearing about what it was ordering with respect to the fines and fees. The trial court stated that it would decline to impose any of the fines and fees it had "the ability to stay or reduce or

---

17  Among other things, Macovichuk contends that the trial court had the discretion under the principles discussed in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 and subsequent case law, to decide not to impose any of the fines and fees. He also cites other grounds on which he believes the imposition of certain of the fines and fees were discretionary. In light of our disposition, we need not, and do not, consider whether there is merit to Macovichuk's argument that the trial court had the discretion to decline to impose some or all of the fines and fees. Macovichuk may make any such arguments on remand.

vacate," but it did not clearly specify which of the fines and fees fell into that category. The fines and fees it may have been intending to stay, reduce or vacate could have included the $820 base fine and penalty assessment, as well as the restitution fine, the probation revocation restitution fine, the court operations assessment fee and the criminal conviction assessment fee that it mentioned during the sentencing hearing.[18]

As the trial court was unclear about what fines and fees it meant to impose, we will vacate the imposition of the fines and fees set forth in the sentencing minute order and the order granting formal probation, and we will remand this matter to the trial court so that it can clarify, in an oral pronouncement, which fines and fees it intends to impose and in what amounts.

D.    *Macovichuk's Challenge to Two of the Probation Conditions Lacks Merit*

In his opening brief, Macovichuk argues that two of the conditions of probation appearing in the November 10, 2021 order granting formal probation violated his constitutional rights. As he did not object to either of the conditions in the trial court, Macovichuk acknowledges that he is limited to a facial constitutional challenge of those two probation conditions. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887-889 (*Sheena K.*).)

The two conditions are as follows: (1) the requirement in paragraph 6.k, which states, "Provide true name, address, and date of birth if contacted by law enforcement. Report contact or arrest in writing to the [probation

---

[18]    It appears that the trial court intended to impose the restitution fine and the probation revocation restitution fine, but even as to those the record contains some uncertainty, as the trial court stated, "I don't know—I don't believe I have any ability to reduce or stay" them. To the extent the trial court *did* definitively intend to impose those fines, the sentencing minute order and the order granting formal probation are *consistent* with that determination rather than *inconsistent* as Macovichuk contends.

officer] within 7 days.  Include the date of contact/arrest, charges, if any, and the name of the law enforcement agency"; and (2) the requirement in paragraph 6.l that Macovichuk obtain the consent of his probation officer "before leaving San Diego [C]ounty."  With respect to the second of these conditions, for the first time in his reply brief, Macovichuk informs us that on February 23, 2022, the trial court modified the travel restriction as follows: "Defendant is permitted to travel outside of San Diego County and the State of California for work purposes, not to exceed 30 days.  Defendant to provide probation with 24 hours advance notice prior to leaving."[19]  In his reply brief, Macovichuk modifies his argument to address the amended probation condition, arguing that, even as amended, it is facially unconstitutional.[20]

 We separately examine the two probation conditions.

1. *The Challenge to the Probation Condition in Paragraph 6.k Lacks Merit*

The probation condition in paragraph 6.k requires that Macovichuk provide identifying information "if contacted by law enforcement" and that he "[r]eport contact" in writing to his probation officer.  In his opening appellate brief, focusing on the words "contacted" and "contact," Macovichuk argues that the probation condition is unconstitutionally vague and overbroad because the term "contact" is not defined.  Macovichuk primarily relies on the Third District's opinion in *People v. Relkin* (2016) 6 Cal.App.5th 1188 (*Relkin*), which considered a condition of mandatory supervision requiring

---

[19]    The probation condition was modified by the trial court on February 23, 2022, which is more than a month *before* Macovichuk filed his opening appellate brief on April 4, 2022.

[20]    We afforded the People the opportunity to file a supplemental letter brief to address Macovichuk's challenge to the amended probation condition, as Macovichuk first raised that challenge in his reply brief.

the reporting of contacts with a peace officer, but using different language than at issue here in paragraph 6.k.

Macovichuk's opening appellate brief failed to cite this court's opinion in *People v. Brand* (2021) 59 Cal.App.5th 861, decided more than a year prior, which is directly on point. In *Brand* we considered identical language to that which appears in paragraph 6.k (*id*. at p. 866), and we concluded that it was not unconstitutionally vague or overbroad (*id*. at p. 871). Macovichuk acknowledges *Brand* in his reply brief, and he concedes that it "appears to be controlling here."

We rely on our opinion in *Brand, supra*, 59 Cal.App.5th at pages 870 to 871, to reject Macovichuk's challenge to the probation condition appearing in paragraph 6.k.

2.      *The Challenge to the Probation Condition in Paragraph 6.l, As Amended, Lacks Merit*

Macovichuk contends that the restriction on his travel outside the County of San Diego for reasons other than work without first obtaining the permission of his probation officer is facially unconstitutional because it is both vague and overbroad. Specifically, he contends the probation condition is overbroad because it infringes on his constitutional rights to travel and of association but is "not carefully tailored to the state's interests." He further contends the probation condition is *both* overbroad and vague because it "delegate[s] standardless discretion to the probation officer" in deciding whether to approve the travel.

We consider each argument in turn. "Whether a term of probation is unconstitutionally vague or overbroad presents a question of law, which we review de novo." (*People v. Stapleton* (2017) 9 Cal.App.5th 989, 993 (*Stapleton*).)

29

### a. *The Probation Condition Is Carefully Tailored to a Legitimate State Interest*

A probation condition " 'is unconstitutionally overbroad . . . if it (1) "impinge[s] on constitutional rights," and (2) is not "tailored carefully and reasonably related to the compelling state interest in reformation and rehabilitation." [Citations.]  The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement.' " (*People v. Arevalo* (2018) 19 Cal.App.5th 652, 656-657 (*Arevalo*).)

"Although not explicitly guaranteed in the United States Constitution, '[t]he right to travel, or right of migration, now is seen as an aspect of personal liberty which, when united with the right to travel, requires "that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." ' " (*People v. Moran* (2016) 1 Cal.5th 398, 405 (*Moran*).)

Our Supreme Court has explained the legitimate state interest in imposing probation conditions that restrict a person's right to travel. "Imposing a limitation on probationers' movements as a condition of probation is common, as probation officers' awareness of probationers' whereabouts facilitates supervision and rehabilitation and helps ensure probationers are complying with the terms of their conditional release. [Citations.]  [¶]  Although criminal offenders placed on probation retain their constitutional right to travel, reasonable and incidental restrictions on their movement are permissible." (*Moran, supra*, 1 Cal.5th at p. 406.)

Case law has held that when a probation condition does not bar a person's ability to travel altogether but instead requires advance permission from a probation officer, the condition is closely tailored to avoid unconstitutional overbreadth. (*Relkin*, *supra*, 6 Cal.App.5th at p. 1195 ["the condition's limitation on interstate travel is closely tailored to the purpose of monitoring defendant's travel to and from California not by barring his ability to travel altogether but by requiring that he first obtain written permission before doing so"]; *In re Antonio R.* (2000) 78 Cal.App.4th 937, 942 (*Antonio R.*) [a minor's constitutional rights were not "impermissibly burdened" by a probation condition restricting travel to Los Angeles County from Orange County in light of the "safety valve" that allowed such travel with the permission of a probation officer or a parent (italics omitted)]; *People v. Thrash* (1978) 80 Cal.App.3d 898, 902 [rejecting a challenge to a probation condition providing that "the defendant is not to leave town without getting permission from the proper authorities"].)

Here, because the probation condition does not contain an outright ban on travel outside the county, but instead permits such travel (1) at any time, not to exceed 30 days, for work purposes; and (2) at any other time with the "safety valve" of probation officer permission (*Antonio R.*, *supra*, 78 Cal.App.4th at p. 942), it is carefully tailored to avoid being impermissibly overbroad.

      b.    *The Probation Condition Is Not Vague or Overbroad Due to the Probation Officer's Discretion Whether to Approve Travel*

Macovichuk argues that because his ability to travel (except for work purposes) depends on permission from the probation officer, the probation condition is both overbroad and vague in that it "delegates standardless discretion to the probation officer." He contends that the probation officer is

"subject to no standards set by the court" and there are "no limits on the probation officer's discretion."

We reject the argument in the context of this facial challenge. A probation condition "should be given 'the meaning that would appear to a reasonable, objective reader,' " and in giving it this meaning, one may presume that a probation officer will not withhold approval for irrational or capricious reasons. (*People v. Olguin*, 45 Cal.4th 375, 382-383.) The grant of discretionary authority to a probation officer includes an implicit requirement that the discretion be exercised reasonably. (See *Stapleton, supra,* 9 Cal.App.5th 989, 996-997 ["A probation officer cannot issue directives that are not reasonable in light of the authority granted to the officer by the court. Thus, a probation officer cannot use the residence condition to arbitrarily disapprove a defendant's place of residence"]; see also *Arevalo, supra,* 19 Cal.App.5th at p. 658 [a condition giving the probation officer approval power over the probationer's residence "presumes a probation officer will not withhold approval for irrational or capricious reasons"].) Here, even though the probation condition at issue permits a probation officer to exercise discretion in granting or denying a request to leave the county, it "does not grant . . . the power to issue arbitrary or capricious directives that the court itself could not order." (*Stapleton*, at pp. 996-997, citing *People v. Kwizera* (2000) 78 Cal.App.4th 1238, 1240-1241 [a probation condition requiring a probationer to obey directions from his probation officer did not give the probation officer "power to impose unreasonable probation conditions"].) Therefore, the probation officer's discretion to approve or disapprove travel, in itself, does not render the probation condition unconstitutionally overbroad for the purpose of a facial constitutional

challenge, as we "presume[ ] a probation officer will not withhold approval for irrational or capricious reasons." (*Arevalo*, at p. 658.)

With respect to the vagueness challenge, "[a] probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness." (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.) Here, although the probation officer has the discretion to approve or disapprove a request to travel, there is no logical reason why Macovichuk should be uncertain about whether he is permitted to travel out of the county on any specific occasion. Because the probation condition plainly states that Macovichuk must obtain permission from his probation officer *before* traveling outside San Diego County for non-work purposes, the probation condition is sufficiently precise for Macovichuk to know exactly what is required of him and for the court to determine if the condition has been violated. Macovichuk need only make a request to travel and then wait for the response to know whether or not he may travel outside the county on any specific date for non-work purposes, and if he travels for non-work purposes without such permission, he has violated the condition.

## DISPOSITION

The imposition of the fines and fees in the November 10, 2021 sentencing minute order and the order granting formal probation are vacated.  This matter is remanded to the trial court so that it may make an oral pronouncement regarding the fines and fees that it intends to impose.  In all other respects, the judgment is affirmed.


IRION, J.

WE CONCUR:



McCONNELL, P. J.



DO, J.

34